ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| Lockheed Martin Aeronautics Company | ) ASBCA No. 62209 |
| | ) |
| Under Contract No. FA8625-07-C-6471 | ) |

APPEARANCES FOR THE APPELLANT:    Stephen J. McBrady, Esq.
                                                                J. Chris Haile, Esq.
                                                                Skye Mathieson, Esq.
                                                                Michelle D. Coleman, Esq.
                                                                John Nakoneczny, Esq.
                                                                  Crowell & Moring LLP
                                                                  Washington, DC

APPEARANCES FOR THE GOVERNMENT:    Jeffrey P. Hildebrant, Esq.
                                                                  Deputy Chief Trial Attorney
                                                                Caryl A. Potter, III, Esq.
                                                                Lawrence M. Anderson, Esq.
                                                                  Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE PAGE ON THE PARTIES'
SECOND SET OF CROSS-MOTIONS FOR SUMMARY JUDGMENT

This appeal is made pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§ 7101-7109 (CDA). It arises from the $143,529,290 claim brought by Lockheed Martin Aeronautics Company (Lockheed Martin, LMA, LM, appellant, or contractor) against the Air Force (Air Force, USAF, government, or respondent). The underlying contract required LMA to upgrade 49 government-owned C-5 Galaxy aircraft. Appellant seeks to recover for costs associated with allegedly excessive "over and above" (O&A) repairs for particular airplanes and cumulative impacts; it relies upon the "measured mile" legal theory to prove its claim. Lockheed Martin previously was compensated for direct costs of this work, which was required by the government's issuance of "manufacturing deficiency reports" (MDRs[1]). This decision addresses the parties' second set of cross-motions for summary judgment.[2] We do not reach the

_____

[1] According to appellant, the "parties have also referred to MDRs as 'Material Deficiency Reports'" (app. mot. & opp'n at 10 n.2).

[2] Where relevant, we reference the Board's decision on the parties' first set of seven cross-motions for summary judgment dated April 13, 2022. The Board there granted only appellant's second and third cross-motions and (*inter alia*) found that Lockheed Martin's claim was timely made. Also, where relevant, we adopt

merits of Lockheed Martin's claim but grant appellant's motions and deny the government's.[3]

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

*The Contract*

1. On April 30, 2007, the Air Force awarded Contract No. FA8625-07-C-6471, the "Reliability Enhancement and ReEngining Program" (RERP) to Lockheed Martin (R4, tab 3) as an undefinitized action (complaint (compl.) ¶ 15). The contractor was required to provide a set of upgrades to each of 49 government-owned C-5 Galaxy aircraft. This included the installation of new CF6-80C2 commercial engines and other enhancements to subsystems and major components; the work was done under mostly fixed-price contract line items (CLINs). (R4, tab 3 at 3-13) "The C-5 Galaxy is the largest military transport aircraft in the United States [g]overnment's fleet" (compl. ¶ 10).

2. The 49 RERP aircraft to be reworked were informally designated by the parties as P-1 through P-49. *LMA*, 22-1 BCA ¶ 38,112 at 185,114 (citing JSF 1). These aircraft were grouped into seven lots comprised of varying numbers of planes for the RERP work. The 21 aircraft at issue in this appeal are aircrafts P-7 through P-27; these were part of Lots 3, 4, and 5. *Id*. (citing JSF 2).

---

portions of the Statement of Facts (SOF) from that ruling; these include the parties' joint stipulations of fact (JSF) that were accepted by the Board. *See Lockheed Martin Aeronautics Co*., ASBCA No. 62209, 22-1 BCA ¶ 38,112 at 185,114; for ease of reference, we cite this decision hereafter as *LMA*, 22-1 BCA ¶ 38,112.

[3] We refer collectively to the government's second set of motions for summary judgment as "gov't mot." References to "Appellant's Cross-Motions for Summary Judgment Regarding the Government's Affirmative Defense of Release, and Response in Opposition to the Government's Motions for Summary Regarding Release, Entitlement, and Count III" are to "app. mot. & opp'n." We similarly cite "Respondent's Reply (Corrected) In Support of Its Second [Set of] Motion[s] for Summary Judgment and Opposition to Appellant's Cross-Motions" as "gov't reply & opp'n," and "Respondent's Sur-Reply in Support of Its Second [Set of] Motion[s] for Summary Judgment" as "gov't surreply." In like fashion, "Appellant's Reply in Support of Its Cross-Motions for Summary Judgment Regarding the Government's Affirmative Defense of Release" and "Appellant's Sur-reply to the Respondent's Reply in Support of Respondent's Motion for Summary Judgment on Entitlement" are respectively referred to as "app. reply" and "app. surreply."

3.  The total amount of the contract was "NTE [not to exceed] $23,000,000" (R4, tab 3 at 4).  The contract incorporated by reference Federal Acquisition Regulation (FAR) 52.233-1, DISPUTES (JUL 2002) – ALTERNATE I (DEC 1991) (*id*. at 35).  It also contained FAR 52.243-01, CHANGES – FIXED-PRICE (AUG 1987), which applied "to Firm-Fixed-Price CLIN(s), Fixed-Price Incentive (Firm Target) CLIN(s) only" as well as FAR 52.243-03, CHANGES – TIME-AND-MATERIALS OR LABOR-HOURS (SEP 2000), which applied "to Time-and-Materials [T&M] CLIN(s) only" (*id*. at 36).[4]

4.  The contract included the full text of clause B036, CONTRACT TYPE: TIME-AND-MATERIALS (FEB 1997) (TAILORED):

>  (a)  The Contractor shall furnish at the hourly rates stated below, all necessary and qualified personnel, managing and directing the same to complete all T&M CLINS within the performance period specified in Section F.  In performance of these CLIN(s), Contractor shall be reimbursed for direct labor (exclusive of any work performed in an unpaid overtime status) at the hourly rates listed in Section J as an attachment.

>  CATEGORIES HOURLY RATE

>  Rates will be established each year and incorporated into the contract as an attachment.

>  (b)  For the purposes of the clause of this contract entitled "Payments Under Time-and-Material and Labor-Hour Contracts," the total ceiling price of the CLIN(s) specified in paragraph (a) above is $0.00.  *Applies to [T&M] CLINS only.*

(R4, tab 3 at 14) (emphasis in original)

5.  Contract clause FAR 52.243-07, NOTIFICATION OF CHANGES (APR 1984) provided in ¶ (b) that the "Number of calendar days is (insert 30 for RDSC/C) '30 days.'"  Although the contract incorporated this clause by reference, when this paragraph is read in full with the insertion, it provides in relevant part:

>  . . . .

---

[4] "CLIN" is an acronym for "Contract Line Item Number."

3

(b) *Notice*. The primary purpose of this clause is to obtain prompt reporting of Government conduct that the Contractor considers to constitute a change to this contract. Except for changes identified as such in writing and signed by the Contracting Officer [CO], the Contractor shall notify the Administrative Contracting Officer [ACO] in writing promptly, within 30 days from the date that the Contractor identifies any Government conduct (including actions, inactions, and written or oral communications) that the Contractor regards as a change to the contract terms and conditions . . .

. . . .

(R4, tab 3 at 36)

6. Contract clause H106, RAPID REPAIR AND RESPONSE (R3) (MAR 2006) provides in relevant part at ¶ 3.f:

f. If an R3 activity(s) causes an increase or decrease in the cost of, or the time required for, performance of any part of the work under this contract, the [CO] will make an equitable adjustment in the contract price, the delivery schedule, or both. The Contractor shall assert its right to an adjustment under this paragraph within 90 days from completion of the R3 activity that the Contractor believes causes an increase in cost or schedule. The right to an equitable adjustment shall be the Contractor's exclusive remedy and the Government shall not be liable to suit for breach of contract for actions accomplished in accordance with the R3 clause. Failure to agree to an adjustment shall be a dispute under the Disputes clause. Nothing in this clause, however, shall excuse the Contractor from proceeding with the contract as charged.

(R4, tab 3 at 26-27)

*Bilateral Contract Modifications Relevant to the Parties' Cross-Motions for Summary Judgment*

7. The government and Lockheed Martin entered into a number of bilateral contract modifications that are relevant to the parties' cross-motions for summary

judgment. These include the following, as summarized by modification number and date of execution:

(a) Modification (Mod.) P00067, executed October 19, 2010, exercised Lot 3 Installation Fixed-Price CLIN 3004 and Lot 4 Support Equipment Fixed-Price CLIN 4006 with a value and obligation of $110,824,650 and $4,833,539 respectively (app. supp. R4, tab 64 at 1, 3-4);

(b) Mod. P00075, executed January 12, 2011, increased the value and funding of T&M CLIN 2005 in Lot 2 and CLIN 3005 in Lot 3 by a total of $6,105,714 (app. supp. R4, tab 75 at 1, 3);

(c) Mod. P00102, executed October 21, 2011, incorporated Lot 4 Fixed-Price Installation CLIN 4004 with a value of $126,674,272 and increased the obligation by $63,583,152 (R4, tab 5);

(d) Mod. P00116, executed October 20, 2011, among other things exercised the government's option for Lot 4 and established a number of CLINs related to Lot 4. This included Lot 4 T&M R3 CLIN 4005 with a value and obligation of $3,000,000. (App. mot. & opp'n, ex. 19 at 2, 4);

(e) Mod. P00166, executed October 19, 2012, inserted the Lot 5 Firm-Fixed-Price Installation CLIN 5004 with a value and obligation of $221,758,366 (R4, tab 6 at 1, 3);

(f) Mod. P00178, executed November 6, 2012, was a supplemental agreement with the primary purpose of re-baselining the RERP production and delivery schedule for Lot 2, aircraft 2 [P-3] through Lot 7, aircraft 11 [P-49], with no change in contract price (R4, tab 7 at 1, 3);

(g) Mod. P00182, executed April 25, 2013, increased the contract price to $45,651,026, and converted work being done under the H106 clause from a T&M basis to a cost-plus-fixed-fee (CPFF) basis. It established new CPFF CLINs for the O&A work, including CLIN 3020 for Lot 3, CLIN 4025 for Lot 4, and CLIN 5021 for Lot 5. (R4, tab 10. at 1, 3-10);

(h) Mod. P00196, executed December 20, 2012, established Lot 5 T&M R3 CLIN 5013 with a value and obligation of $303,500 (app. supp. R4, tab 186 at 1, 3);

(i) Mod. P00228, executed May 30, 2013, increased the value and obligation of Lot 5 T&M R3 CLIN 5013 with a value and obligation of $358,406 (app. supp. R4, tab 216 at 1, 3);

5

(j)  Mod. P00235, executed July 3, 2013, increased the value and obligation for the Lot 3 CPFF R3 CLIN 3020 by $800,000 (gov't R4, tab 36 at 1, 3);

(k)  Mod. P00263, executed by the government on December 10, 2013, increased the value and obligation of Lot 4 CPFF R3 CLIN 4025 by $3,700,000 (R4, tab 37 at 1, 3);

(l)  Mod. P00300, executed on July 30, 2014, incorporated Contract Change Proposal (PPD) 14-00014, entitled "Lot 6 Rapid Repair and Response (R3)" and established Lot 6 CPFF R3 CLIN 6019 with a change in price and obligation of $3,283,413 (app. supp. R4, tab 277 at 1, 3); and

(m)  Mod. P00346, executed September 29, 2015, increased the value and obligation of Lot 6 CPFF R3 CLIN 6019 by $1,200,000 and decreased the value and obligation of Lot 5 CPFF R3 CLIN 5021 by $1,200,00, which removed excess funds from Lot 5 CPFF R3 CLIN 5021 (R4, tab 39 at 1, 3).

8.  The following contract modifications (1) did not identify specific O&A repairs or the volume of O&A repair work that Lockheed Martin ultimately would be required to perform for the government; (2) did not provide any equitable adjustment for the impacts of O&A repairs; and (3) did not affect any change upon which Lockheed Martin's claims are based:  Mod. P00067 (app. supp. R4, tab 64); Mod. P00075 (app. supp. R4, tab 75); Mod. P00102 (R4, tab 5); Mod. P00116 (app. mot. & opp'n, ex. 19); Mod. P00166 (R4, tab 6); Mod. P00182 (R4, tab 10); Mod. P00196 (app. supp. R4, tab 186); Mod. P00228 (app. supp. R4, tab 216); Mod. P00235 (R4, tab 36); Mod. P00263 (R4, tab 37); Mod. P00300 (app. supp. R4, tab 277); and Mod. P00346 (R4, tab 39).

9.  Each of the contract modifications cited in SOF ¶ 8 contained the following release language:

> This Supplemental Agreement constitutes a full and equitable adjustment and the Contractor releases the Government from any and all liability under the contract for further claims or equitable adjustments arising out of or in connection with the changes effected hereby.  All other contract terms and conditions remain unchanged and in full force and effect as a result of this modification.

*See, e.g.*, Mod. P00067 (app. supp. R4, tab 64 at 5); Mod. P00075 (app. supp. R4, tab 75 at 5); Mod. P00102 (R4, tab 5 at 5); Mod. P00116 (app. mot. & opp'n, ex. 19 at 9-10); Mod. P00166 (R4, tab 6 at 14); Mod. P00182 (R4, tab 10 at 17); Mod.

P00196 (app. supp. R4, tab 186 at 6); Mod. P00228 (app. supp. R4, tab 216 at 5); Mod. P00235 (R4, tab 36 at 6); Mod. P00263 (R4, tab 37 at 5-6); Mod. P00300 (app. supp. R4, tab 277 at 5); and Mod. P00346 (R4, tab 39 at 8).

10. Contract Modification No. P00178 contained the following release of claims by Lockheed Martin:

. . . .

3. This Supplemental Agreement constitutes a full and equitable adjustment between the Government and the Contractor arising out of or in connection with all C-5 RERP Production Schedule impacts, including the pylon sheer plate, improperly manufactured tower fitting, LM Aero manufacturing manning needs, etc., to the date of this Supplemental Agreement execution except for the issues associated with the Bucket Engineering Change Proposal (ECP) 12-00012A, that LM Aero is preparing. The "Bucket ECP" will address the cost impact of those issues; however, the Contractor will not seek any further adjustments to the C-5 RERP Production Schedule. Once fully executed, the "Bucket ECP" (ECP 12-00012A) effort and this Supplemental Agreement (P00178) will constitute a full and equitable adjustment between the Government and the Contractor and release all parties from liability under the contract for further claims or equitable adjustments arising out of or in connection with any past legacy issues, runway closure, the aircraft cut wire, DCMA [Defense Contract Management Agency] flight crew availability, and/or DCMA additional inspection requirements in addition to the issues discussed in Paragraph 1 of this contract modification.

(R4, tab 7 at 20-21) (emphasis added)

11. In addition to fixed-price RERP modernization work, the contract also required Lockheed Martin to perform O&A repair work for the aircraft under other CLINs, which were entitled "Rapid Repair and Response" or "R3." This work is shown in CLINs 1005, 2005, 3005, and 4005 (R4, tab 3 at 6, 9, 11, and 13). "O&A repair work was performed on a T&M basis until April 28, 2013. Thereafter, it was done on a [CPFF] basis pursuant to Mod. P00182." *LMA*, 22-1 BCA ¶ 38,112 at 185,115 (citing R4, tab 10; JSF 3).

7

12. The contract's "Statement of Work (SOW)" for the "Low Rate Initial Production (LRIP) for the C-5M" efforts for Lots 1, 2, 3, and 4 is dated April 30, 2007 (R4, tab 3 at 1, 73). The SOW provided at ¶ 3.2.1:

> 3.1.2 Aircraft Modification
>
> The Contractor shall provide all necessary facilities and services required to modify the C-5 aircraft to the C-5M configuration in accordance with this Statement of Work. Systems, processes and staffing requirements used to build the SDD[5] aircraft shall form the baseline for the first production vehicle. Improvements and changes to systems, processes, and staffing requirements shall be incorporated as required to ensure conformity to the technical baseline as defined in Section H, Clause H100.
>
> The Contractor shall maintain a Manufacturing Plan that reflects the C-5M workflow. Any work required to bring the aircraft to flight worthiness that is beyond the scope of this contract shall be accomplished on a Rapid Repair & Response (R3) basis, in accordance with the R3 clause, H106, or other mutually agreeable contractual arrangement.

(*Id*. at 75) (emphasis added)

13. The original contract did not contain a "Lot 5" (*see, e.g.*, R4, tab 3 at 5-13). In bilateral Mod. P00166 dated October 19, 2012, the parties "incorporate[d] by reference, Contract Change Proposal (CCP) 11-00159, C-5 RERP Lot 5 Installations and to incorporate [CLIN] 5004 for Lot 5 Installations" (R4, tab 6 at 1, 3).

14. Mod. P00182 also amended the contract to "incorporate the revised special contract requirement H106 Clause 'Rapid Repair and Response (R3) for C-5 Modernization (MAR 2013).'" The modified clause reads in relevant part:

> H106 RAPID REPAIR AND RESPONSE (R3) (MAR 2013)
>
> A. The below R3 procedures will be utilized for R3 efforts submitted on or before 28 Apr 2013 and those efforts being

---

[5] "SDD" is an acronym for "System Development and Demonstration" (*see*, *e.g.*, R4, tab 3 at 22). The parties previously had entered into an SDD contract for the upgrade of certain other aircraft (compl. ¶ 13).

8

completed or reworked associated with those R3 MDR efforts.  New R3 efforts will utilize the procedures in Paragraph B:

. . . .

3.  WORK REQUESTS:

a.  The Contractor shall prepare and submit a work request to notify the [ACO] or his/her authorized representative of a legacy discrepancy that requires repair.  The ACO or his/her authorized representative will review the work request to determine whether the work is within the general scope of the R3 CLIN.  The Government reserves the right to question any work request that does not appear to be reasonable.  Upon Government determination that it is appropriate to accomplish the work under the R3 CLIN(s), the Contractor shall perform the work described on the work request.  The Contractor shall not be bound by individual work request hours, but the cumulative actual cost of labor and materials shall not exceed the NTE amount established in the applicable R3 CLIN(s). Contractor performance of work approved by the ACO or his/her authorized representative is subject to availability of funds on the applicable R3 CLIN.

. . . .

f.  If an R3 activity causes an increase or decrease in the cost of, or the time required for, performance of any part of work under this contract, the [CO] will make an equitable adjustment in the contract prices, the delivery schedule, or both.  The Contractor shall assert its right to an equitable adjustment under this paragraph within 90 days from completion of the R3 activity that the Contractor believes causes an increase in cost or schedule.  The right to an equitable adjustment shall be the Contractor's exclusive remedy and the Government shall not be liable to suit for breach of contract for actions accomplished in accordance with the R3 clause.  Failure to agree to an adjustment shall be a dispute under the Disputes clause.  Nothing in this clause, however, shall excuse the Contractor from proceeding with the contract as changed.

9

(R4, tab 10 at 12-13)

15. Pursuant to bilateral Mod. P00182, the contractor was not required by the applicable Contract H106 clauses for Lots 3-5 to perform O&A work (labor and materials) beyond the funding obligated in the R3 [O&A] CLIN for each of those three lots (*see, e.g.*, R4, tab 10 at 1-3, 12, 15). Performance by Lockheed Martin of O&A work beyond the funding obligated on the applicable R3 CLIN for each of Lots 3-5 was "at the Contractor's own risk." In reporting "R3 Activity," the contractor was required to "provide the ACO a summary of actual costs charged for completed R3 labor tasks and materials on a monthly basis." (*Id*. at 10, 13, 15-17) This modification also incorporated FAR 52.232-20, "Limitation of Cost" and FAR 52.216-7, "Allowable Cost and Payment" (*id*. at 17).

16. A presentation for the November 21, 2013 Project Management Review (an event attended by both parties) notes that "[c]osts for legacy delay and disruption have not been contractually addressed" (app. supp. R4, tab 426 at 1, 10). The presentation also stated, "No schedule or cost impacts for disruption have been contractually addressed" (*id*. at 10). The presenters for the "Delay and Disruption" portion of the presentation were Mike Astahoff and Tom Hungerford[6] (*id*. at 2, 9). This presentation indicates the parties were aware of the concern over the disruptive impacts of O&A work (*id*. at 10-14).

17. On September 11, 2014, Lockheed Martin advised the CO of its reservation of right to an equitable adjustment resulting from delay and disruption to its planned sequence of work, and reminded the government this issue had been previously raised:

> 1. This letter provides written notice confirming that Lockheed Martin (LM) has reserved its right to an equitable adjustment to the subject contract.
>
> 2. The basis for the reservation of right to submit a request for equitable adjustment [is] that there are several issues occurring that are the responsibility of the Government in support of this contract. These issues are causing delay and disruption and/or scope growth which have impacted LM's ability to perform the contract baseline. LM is currently evaluating these impacts and will provide the Government an update at a later date should we choose to pursue a formal Request for Equitable Adjustment (REA).

---

[6] Mr. Hungerford is identified by appellant as an LMA employee; *see, e.g.*, app. mot. & opp'n, ex. 3.

> LM has previously discussed these at the C-5 Summit (19 December 2013), detail LM/USAF cost review (9 December 2013), C-5 RERP Lot 6 & 7 Proposal Review with Director of the [DCMA] (14 February, 2014) and numerous other discussions during RERP FY14 negotiations and program meetings.

(App. supp. R4, tab 591)

18.  In his declaration dated April 9, 2021,  Steven Pilcher, who was C-5 Contracts Administrator for Lockheed Martin for his entire time on the contract, stated that he was involved in the negotiations and/or review of multiple contract modifications; he is familiar with the claim.  He signed Mod. P00067, Mod. P00075, Mod. P00102, Mod. P00116, Mod. P00166, Mod. P00182, Mod. P00300, Mod. P00301, and Mod. P00346.  Mr. Pilcher managed the LMA employees who signed Mod. P00196, Mod. P00228, Mod. P00235, and Mod. P00263.  (App. mot. & opp'n, ex. 1 ¶¶ 1-2, 4-5)

19.  Mr. Pilcher stated that he understood the release cited in these modifications (*see* SOF ¶¶ 8-9, 18, 25) was a "standard government release"; it was not specially negotiated.  He believed then and now that this provision "serves to release only claims arising out of or in connection with the changes made in the modifications."  He did not "understand the inclusion of this standard release in a modification that added funding to an O&A CLIN to release any of Lockheed Martin's rights with respect to the impacts of O&A work that [it] was required to perform either before or after the modification."  Nor did the parties discuss that the releases in these "modifications would serve to bar a performance-related claim, including Lockheed Martin's certified claim that is the subject of this appeal."  (App. mot. & opp'n, ex. 1 ¶¶ 7-9)

20.  Mr. Pilcher provided additional information regarding Mod. P00182, which "included changes to the [H106] clause that converted O&A work from time-and-materials (T&M) to cost-plus-fixed-fee payment."  Other changes to the H106 "clause included allowing Lockheed Martin to start work on [MDRs] before receiving approval from the government, required troubleshooting legacy conditions before submitting an MDR, [and] required including detailed descriptions of legacy discrepancy when submitting an MDR work request . . . ."  (App. mot. & opp'n, ex. 1 ¶¶ 15-16)

21.  Another change made by Mod. P00182 was to delete that portion of H106 that entitled Lockheed Martin to an "equitable adjustment if O&A work caused an increase or decrease in the cost and/or schedule of any part of the contract." Mr. Pilcher recounted a conversation with CO Jeffrey Joseph and Bill Brotherton,

Director of C-5 Business Management for Lockheed Martin. According to Mr. Pilcher, CO Joseph "stated that the Government suggested removing the equitable adjustment language" from the H106 clause "because other clauses in the Contract, such as the Changes clause, already provided Lockheed Martin with the right to an equitable adjustment for O&A impacts." Mr. Pilcher said the government did not suggest at any time during the negotiation of Mod. P00182 "that Lockheed Martin should not be entitled to, or that Lockheed Martin was giving up its right to, an equitable adjustment of the contract for impacts of O&A work." He says he relied upon CO Joseph's explanation "that the Changes clause would continue to provide Lockheed Martin's right to an equitable adjustment, when executing [Mod.] P00182." (App. mot. & opp'n, ex. 1 ¶¶ 16-18)

22. Mr. Pilcher provided the contractor's perspective regarding Mod. P00301, which modified and added funding to CPFF CLINs 6019 and 6020. This modification and the release therein were prepared by the government without the input of the contractor. It was executed after Lockheed Martin provided notice to the CO on September 11, 2014, that the contractor "reserve[ed] its right to an equitable adjustment for delay and disruption and/or scope growth impacting Lockheed Martin's ability to perform the contract baseline." (App. mot. & opp'n, ex. 1 ¶¶ 10-12)

23. From discussions with the government, Mr. Pilcher stated that he understood that Mod. P00301 was a forward-looking contract change. It "was being implemented to try and resolve O&A impact issues going forward for Lots 6 and 7 . . . and getting [both] the Air Force and [DCMA], involved in reducing the level of O&A in an attempt to reduce the impact of O&A on RERP performance." (App. mot. & opp'n, ex. 1 ¶¶ 12-14)

24. On September 30, 2014, the parties executed Mod. P00301; the "subject" was stated as "Lot 6 Rapid Repair and Response (R3), O&A for Aircrafts 6-2 through 6-11" (R4, tab 12 at 1). The modification's "Schedule of Changes" stated:

> 1. Pursuant to the authority cited in block 13C of this contract modification, this contract action hereby incorporates the negotiated cost and schedule for Contract Change Proposal (CCP) 14-00014, entitled, "Lot 6 Rapid Repair and Repsone [sic] (R3)". This contract action incorporates Over and Above work under Cost-Plus-Fixed-Fee (CPFF) CLINs 6019 and 6020 for Lot 6 Rapid Repair and Response (R3) for aircrafts 6-2 through 6-11. The revised Special Contract Requirements clause H106 and H139 clause are incorporated into this modification.

(*Id*. at 3) (emphasis added)

12

25.  Changes to the contract as a result of Mod. P00301 were described as follows:

> 2. This contract modification hereby:
>
> > a.  Modifies Contract Line Item Number CLIN 6019 by increasing funding in the amount of $9,893,429.10 of FY12 3010 appropriations for aircrafts (6-2 to 6-4).
> >
> > b.  Establishes Contract Line Item Number CLIN 6020 to provide funding in the amount of $23,084,667.90 of FY14 3010 approprirations [sic] for aircrafts (6-5 to 6-11).
> >
> > c.  Modifies Section H, Special Contract Requirement H106, "Rapid Repair and Response (R3)" (AUG 2014) to incorporate revised procedures.
> >
> > d.  Modifies Section H, Special Contract Requirement H139, "Joint USAF and LM Action Plan Implementation" AUG 2014 to incorporate revised procedures.

(R4, tab 12 at 3)

26.  In accordance with Mod. P00301, "Category 2" MDRs were identified as those "[l]egacy condition repairs meeting the criteria of the scope of the H106 Clause and charged against the O&A CLIN" (R4, tab 12 at 9).

27.  Appellant also provided a declaration from Michael S. Smith, who began working on the RERP project as a Contract Administrator for LMA beginning January 2007.  He became a Senior Manager of Business Operations in July 2018 and remains involved in the RERP Program.  Mr. Smith gave examples of the parties' continued discussions regarding Lockheed Martin's May 2018 REA until at least August 25, 2020.  He denied that the government "ever suggest[ed] that Lockheed Martin had released its claims" during that period.  (App. mot. & opp'n, ex. 2)

28.  Lockheed Martin submitted the declaration of Thomas Hungerford, who held various business management positions for LMA on the RERP contract from August 2013 to about May 2018; he currently is a Vice President of Business operations for

13

the company.  He assisted with the preparation of LMA's REA and claim, which sought an equitable adjustment for O&A impacts for Lots 3-5.  According to Mr. Hungerford, the government "continued to discuss the merits of the REA, including after [LMA] became aware that [Air Force] legal counsel became engaged on or about May 2018."  (App. mot. & opp'n, ex. 3)

29.  Changes to contract clause H139 "Joint USAF and LM Action Plan Implementation (Aug 2014)" brought about by Mod. P00301 included the following limits on MDRs for Lots 6 and 7:

> 1.  Category 2 [MDRs] shall be limited to a total of 400 occurrences per aircraft average per lot for Lot 6 and Lot 7.
>
> 2.  The following types of MDRs will be excluded from the 400 count:
>
>> a.  Closed and cancelled MDRs that change from Category 2 to a Category 1, 3 or QAR
>>
>> b.  Duplicate and blank MDRs
>>
>> c.  MDR's [sic] directed during induction by the Procurement [CO] Letter of Direction
>
> 3.  Government authorized legacy defects dispositioned as an MDR for repair shall be completed as Over and Above (O&A).
>
> 4.  The contractor shall submit interim monthly reports (cumulative MDR graph) to the Program Office and DCMA by aircraft.  The contractor shall submit a final report for each aircraft 45 calendar days after aircraft delivery (DD 250), with a listing of all MDRs that meet the criteria identified in paragraph 2.  In the event that an aircraft MDR count exceeds 400 and it is forecasted that Lot 6 or 7 average MDR count per aircraft will exceed 400 MDRs, a listing of all zero hour MDRs that the contractor determines did not have an impact to the aircraft(s) cost or schedule performance will be provided.

(R4, tab 12 at 12-13) (emphasis added)

30. Mod. P00301 also called for a government "On-Site Representative (OSR)" (R4, tab 12 at 10) "to provide a rapid response to the Contractor of the discrepancies presented for disposition decisions" (*id.* at 13). In addition, the "Government Advisory Team (GAT)" was to "provide the OSR(s) any necessary field perspective and experience to support [the] OSR(s) rapid determination of legacy content not to be documented and/or worked by LM." The GAT was to give the contractor and the government fleet "operational feedback to attenuate program focus on conditions and practices from a fleet perspective [versus] an original equipment manufacturer (OEM) perspective." The GAT was also to furnish Lockheed Martin "informal training" and "relevant lessons learned on fleet practices and equipment that can improve execution of aircraft operations in terms of legacy systems operations and content. (*Id.* at 14)

31. Mod. P00301 contained the following release of claims:

> 3. RELEASE OF CLAIMS: This supplemental agreement constitutes a full and equitable adjustment and the Contractor releases the Government from any and all liability under the contract for further claims or equitable adjustments arising out of or in connection with the changes effected hereby. All other contract terms and conditions remain unchanged and are in full force and effect as a result of this modification.

(R4, tab 12 at 3)

*Lockheed Martin's Claim*

32. On October 15, 2018, pursuant to the CDA and the contract's FAR 52.233-1, DISPUTES clause, Lockheed Martin submitted a certified claim in the amount of $143,529,290; it requested a final decision from a government CO (R4, tab 2 at 1-3). LMA's claim alleges that "excessive O&A work changes resulted in an additional, constructive change in the form of cumulative impacts to the performance of the fixed-price RERP effort" (*id.* at 21). Appellant "calculates a total of 428,482 production hours attributable to the cumulative disruptive impacts of O&A changes" in its claim (*id.* at 25). *LMA*, 22-1 BCA ¶ 38,112 at 185,117 (citing JSF 5).

33. Appellant cannot state, for each individual aircraft designated P-7 through P-27, a specific number of hours of "excessive O&A work." Lockheed Martin says it did not keep such information in its course of business with respect to each aircraft. (Gov't mot. at 22-23 citing ex. R-7 "Appellant's Response to Respondent's First Set of

Interrogatories"; *see also id.* ex. R-6, "Appellant's Response to Respondent's Third Set of Interrogatories and Request for Production of Documents" at 5-6; app. mot. & opp'n, ex. 4 ¶ 13 (declaration of Gregory Russ); and app. mot. & opp'n at 57 n.13 referring the government to "the measured-mile analysis in [LMA's] certified claim")

34. LMA's monetary demand is predicated on the legal theory of a "type of measured-mile analysis." Appellant maintains this approach "'provides a comparison of a production period that is impacted by a disruption with a production period that is not impacted.'" (R4, tab 2 at 22 (footnote omitted); *see also id.* at 23-25)

35. Lockheed Martin claims that "a contributor to the high volume of O&A changes on the RERP Contract was such overinspection and increasing of the requirements for O&A work, beyond the anticipated standards to support flight worthiness" (R4, tab 2 at 9). Appellant maintains that "beginning with Lot 3, DCMA imposed overly restrictive flight acceptance criteria, which resulted in Lockheed Martin having to repair many legacy defects that were not required to bring the aircraft into flightworthiness" (*id.* at 11).

36. Lockheed Martin provided a declaration from Gregory Russ, who worked for the company on the RERP contract from inception to the end; he began as Flight Line Director for Lots 1 and 2 and became the "C-5 Director" beginning with Lot 3. Mr. Russ was Flight Line Director with responsibility for all work on the flight line for both the SDD and RERP contracts. He oversaw all O&A work for the SDD contract, regardless of location. On the RERP contract, Mr. Russ had oversight of the completion of O&A work discovered on the flight line and had direct involvement with all O&A work during the modification work. His team "helped the flight line team process the O&A work discovered on the flight line." (App. mot. & opp'n, ex. 4 ¶ 1)

37. Concerning the RERP and SDD contracts, it was Mr. Russ's experience that performance follows a "learning curve" in which the contractor became more efficient with each completed aircraft. He cited the LMA team's continued "experience with the work tasks and [ability] to complete the same work on each succeeding aircraft in less time." Mr. Russ attributed the latter capability to "efficient sequencing of work [that was] dependent upon the ability to work with limited disruptions from unplanned work." Although he did not prepare LMA's proposal, Mr. Russ "provided an estimate of the RERP hours" based upon a review of "every task on the SDD program." That estimate considered "the modification work being performed in the context of the volume of O&A work that was required during SDD performance." (App. mot. & opp'n, ex. 4 ¶ 4)

38. Mr. Russ stated that "the types and amount of O&A work" for Lots 1 & 2 of the RERP contract "were comparable to that required during SDD." However, later

lots required appellant "to perform increasing amounts of O&A work on each aircraft and to make repairs for increasing numbers of minor conditions that Lockheed Martin would not have been required to repair during SDD or on the early RERP aircraft." He gave an example from the SDD contract, in which DCMA directed the contractor to note "a minor defect on the Air Force's Form 781, which signified that the condition would be fixed by the Air Force once the aircraft returned to its home base . . . ." This meant that Lockheed Martin "did not have to fix a legacy condition" as part of its RERP or O&A work if the issue "was not deemed a safety of fight concern or if the condition would not impact the functional test flight requirement." In later RERP work, "DCMA instead required Lockheed Martin to repair (as O&A work) increasing numbers of repairs under [an MDR] for issues that did not impact RERP functionality or that were not safety of flight issues, and would not have been required during the SDD contract." (App. mot. & opp'n, ex. 4 ¶¶ 5-6)

39. Mr. Russ gave other examples of disruptive impacts resulting from the government's allegedly increased standards for O&A work. He opined that "Having to fix legacy conditions that were not a threat to safety of flight and did not impact RERP functionality increased the number of MDRs per aircraft and the volume of O&A work, which caused increasing disruption to the RERP work." (App. mot. & opp'n, ex. 4 ¶ 7) Mr. Russ said that LMA faced receiving Corrective Action Requests (CARs) unless its inspectors adjusted their practices in line with DCMA's increased issuance of MDRs for minor repair work (id. ¶ 9). Work was interrupted by frequent stops and re-starts, which led to delay and "less-efficient progress on the RERP modifications" (id. ¶ 10). This "caused Lockheed Martin to work many more production hours on the RERP effort than it would have if the volume of O&A work had tracked the parties' SDD-based expectations" (id. ¶ 12; see also id. at ¶¶ 7-12).

40. Mr. Russ stated that Lockheed Martin could not separately document the disruptive work caused by the additional O&A effort:

> 13. It was not possible to separately track the additional RERP hours that resulted from the O&A work's impacts. Even if a separate charge code had been created to account for the O&A work's disruption, it would not have been able to account for slow-downs caused by performing out-of-sequence work or for having to work around the O&A work.

(App. mot. & opp'n, ex. 4 ¶ 13)

17

41.  Lockheed Martin's claim lists the following "MDR documents" and "O&A hours" for aircraft P-5 through P-27:

| Lot | Aircraft | MDR Documents | O&A Hours |
|---|---|---|---|
| Lot 3 | AC 3-1 (P-5) | 322 | 6,952 |
| | AC 3-2 (P-6) | 486 | 9,561 |
| | AC 3-5 (P-9) | 342 | 7,074 |
| | AC 3-3 (P-7) | 519 | 10,515 |
| | AC 3-4 (P-8) | 607 | 14,750 |
| Lot 4 | AC 4-1 (P-10) | 558 | 13,690 |
| | AC 4-2 (P-11) | 624 | 14,071 |
| | AC 4-3 (P-12) | 627 | 13,458 |
| | AC 4-4 (P-13) | 676 | 16,223 |
| | AC 4-5 (P-14) | 659 | 15,758 |
| | AC 4-6 (P-15) | 678 | 16,226 |
| | AC 4-7 (P-16) | 598 | 15,457 |
| Lot 5 | AC 5-1 (P-17) | 703 | 14,780 |
| | AC 5-2 (P-18) | 623 | 13,670 |
| | AC 5-3 (P-19) | 630 | 14,005 |
| | AC 5-4 (P-20) | 638 | 15,500 |
| | AC 5-5 (P-21) | 577 | 15,914 |
| | AC 5-6 (P-22) | 461 | 10,508 |
| | AC 5-7 (P-23) | 486 | 13,067 |
| | AC 5-8 (P-24) | 288 | 7,555 |
| | AC 5-9 (P-25) | 335 | 8,358 |
| | AC 5-10 (P-26) | 351 | 8,830 |
| | AC 5-11 (P-27) | 273 | 6,121 |

(R4, tab 2 at 11; *LMA*, 22-1 BCA ¶ 38,112 at 185,117 (citing JSF 8))

42.  By email dated March 22, 2012, Lockheed Martin reported the following O&A hours for aircraft P-1 through P-4.  Work on these planes, which were not included by LMA in the chart depicted in SOF ¶ 41, had been completed under the RERP Contract.  These aircraft were returned to the Air Force prior to March 22, 2012:

a.  P-1 (aka A/C 0082):  9,412 O&A hours (returned to the Air Force – 5 Oct 10)

b.  P-2 (aka A/C 0088):  10,523 O&A hours (returned to the Air Force - 8 Apr 11)

c.  P-3 (aka A/C 0091):  9,819 O&A hours (returned to the Air Force - 24 Aug 11)

d.  P-4 (aka A/C 0093):  10,390 O&A hours (returned to the Air Force 9 Jan 12)

*LMA*, 22-1 BCA ¶ 38,112 at 185,117 (citing JSF 9).

43. The P-5 aircraft was returned to the Air Force on July 20, 2012. This plane is listed in the chart in SOF ¶ 41 as having 6,952 O&A hours. *LMA*, 22-1 BCA ¶ 38,112 at 185,117-18 (citing JSF 10).

44. The P-27 aircraft is one of the 21 aircraft included in LMA's claim as having allegedly had RERP production hours and performance costs improperly increased as a result of disruption caused by excessive O&A work. This plane is listed last in the chart in SOF ¶ 41 with 6,121 O&A hours. *LMA*, 22-1 BCA ¶ 38,112 at 185,118 (citing JSF 11).

45. Lockheed Martin says that its proposal for the contract assumed a baseline of 4,276 O&A hours per aircraft (R4, tab 2 at 22). However, this baseline was not stated in any of O&A CLINs 1005, 2005, 3005, and 4005, nor does it appear anywhere else in the RERP contract as signed in April 2007 (R4, tab 3 *passim*). This baseline is not stated in any contract modification made thereafter. *LMA*, 22-1 BCA ¶ 38,112 at 185,118 (citing JSF 12).

46. LMA's incurrence of claimed increased costs, allegedly caused by the "cumulative disruptive impact of O&A changes" on RERP labor efficiency, pre-dated October 15, 2012. These "impacts" are highlighted in its certified claim, in which Lockheed Martin identifies an "adjustment" of the final amount claimed to "reflect the November 2012 [ ] resolution for past legacy issues." (R4, tab 2 at 25) The downward adjustments for the alleged costs attributable to thousands of hours of "excess O&A disruption" that were performed prior to November 6, 2012, which appellant could not claim after its release in Modification No. P00178, are detailed in cost information developed and submitted by LMA. *LMA*, 22-1 BCA ¶ 38,112 at 185,118 (citing app. supp. R4, tab 436 at 12-13; JSF 20).

47. Lockheed Martin's certified claim seeks to recover only for impacts associated with O&A work/MDRs that took place or were approved after Modification No. P00178, which is dated November 6, 2012 (app. supp. R4, tab 408 at 23, tab 436 at 9, 12-13).

*The CO Declined to Issue a Final Decision*

48. By correspondence dated December 7, 2018, the CO declined to issue a final decision on LMA's claim of October 15, 2018 (R4, tab 1).

*Lockheed Martin's Appeal Was Docketed by the ASBCA and Pleadings Were Filed*

49. On October 3, 2019, the contractor appealed to the ASBCA on the basis of the government's "deemed denial of its 15 October 2018 certified claim." The Board

on October 7, 2019, issued its "Notice of Docketing" and designated the appeal as ASBCA No. 62209.

50. Lockheed Martin's complaint was filed on November 5, 2019. "Count I" for "Disruption – Constructive Changes" alleged that "The high volumes of O&A work disrupted Lockheed Martin's performance of the RERP work, including [adding] 428,482 extra production hours and 277,038 support-factor hours to the RERP work." (Compl. ¶¶ 130-35)

51. "Count II" of LMA's complaint alleged "Overzealous Inspection" by DCMA. The contractor said that "the resulting high volumes of O&A work that [LMA] was required to perform, disrupted Lockheed Martin's performance of the RERP work, adding 428,482 production hours and 277,038 support-factor hours to the RERP work." (Compl. ¶¶ 136-39)

52. In "Count III," the contractor alleged DCMA's "Violation of the Implied Duty of Good Faith and Fair Dealing" (compl. at 24-25). Lockheed Martin asserted that the government "contributed to the excessively high volumes of O&A work added to the RERP Contract by requiring Lockheed Martin to make unnecessary repairs of legacy discrepancies" and "imposed overly restrictive flight-acceptance criteria" (*id*. ¶¶ 141-42). The contractor alleged that the government imposed inappropriate standards that were "more stringent" than it had, *inter alia*, applied "during the SDD program" and "for the first three aircraft under the RERP contract" (*id*. ¶¶ 147-48). It said that "Throughout Lots 3-5, the Government's actions vitiated Lockheed Martin's reasonable expectations in the performance of the contract by causing Lockheed Martin to experience inefficient learning curves and incur $143,529,290 in unanticipated disruption costs" (*id*. ¶ 154).

*The Government's Answer*

53. The government's pleading took exception to each of the counts raised by Lockheed Martin and denied that the record supports the contractor's underlying allegations (answer at 34-42).

54. Among the government's affirmative defenses is that the contractor has released all claims:

> Appellant's certified claim is barred in its entirety by the releases from Appellant relating to Lots 3-5 in bilateral Contract Modifications including, without limitation: P00178 (R4, tab 7 at 20-21); P00182 (R4, tab 10 at 17); P00235 (R4, tab 36 at 6); P00253 (R4, tab 11 at 10); P00263 (R4, tab 37 at 5-6); P00301 (R4, tab 12 at 3);

P00336 (R4, tab 38 at 4); P00346 (R4, tab 39 at 8); and P00396 (R4, tab 13 at 3).

(Answer at 42)

*Discovery Responses Relevant to the Parties' Motions for Summary Judgment*

55. On February 25, 2020, the government sent a second set of interrogatories to LMA. Interrogatory 1.a to appellant stated as follows:

> 1. The H106 Rapid Repair and Response (R3) (March 2013) Clause (R4, tab 10 at 13) provides at subparagraph f. that "The Contractor shall assert its right to an equitable adjustment under this paragraph within 90 days from completion of the R3 activity that the Contractor believes causes an increase in cost or schedule."
>
> a. Does Appellant contend that it in fact asserted such right to an equitable adjustment for R3 efforts "submitted on or before 28 Apr 2013" (R4, tab 10 at 12 (paragraph A))?

(Gov't mot., ex. R-4 at 3-4)

56. On April 10, 2020, Lockheed Martin responded to interrogatory 1.a as follows:

> Yes. Furthermore, Lockheed Martin repeatedly notified the Government, including but not limited to the [CO], the Air Force Program team, and [DCMA], in emails, letters, during Project Management Meetings, during the delay and disruption meetings, during the Cost Summit, in Contractor Performance Assessment Reports (CPARs), etc., of the operative facts that establish Lockheed Martin's claim.

(Gov't mot., ex. R-4 at 4)

57. In the government's second set of interrogatories to appellant, interrogatory 1.b requested the following information:

> b. If Appellant does contend that it in fact asserted such right to an equitable adjustment pursuant to paragraph A.3.f. of the H106 clause, state all facts that support such

21

contention, including, without limitation, the date of each assertion, the person making/signing the assertion to the government, the description or identification of any document transmitting the assertion to the government, and identification of the specific R3 activity (e.g. MDR by its designated number) that "the Contractor believe[d] cause[d] an increase in cost or schedule."

(Gov't mot., ex. R-4 at 4)

58. LMA's response to the government's interrogatory 1.b detailed multiple documents and occasions dating from 2010 through 2014 that it contends placed the government on notice of the operative facts relating to appellant's claim (gov't mot., ex. R-4 at 5-11).

## THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

A review of the contract is a useful preface to our evaluation of the parties' cross-motions for summary judgment. The fixed-price contract for the "Reliability Enhancement and ReEngining Program" was awarded by the government to Lockheed Martin to modify designated C-5 aircraft. The government was permitted to add O&A work that was otherwise outside the scope of the contract in accordance with contract clause H106 or as mutually agreed by the parties. Although the H106 clause initially provided that the O&A repairs that are the subject of LMA's claim would be done on a Time-and-Materials basis, the parties later modified that provision to permit O&A repairs ordered after April 29, 2013 to be performed on a Cost-Plus-Fixed-Fee basis. As relevant to this appeal, contract clause H106 gave Lockheed Martin the right to "an equitable adjustment in the contract prices, the delivery schedule, or both" where the O&A work "cause[d] an increase or decrease in the cost of, or the time required for, performance of any part of work under this contract." The contractor was also authorized to pursue an equitable adjustment under the contract's Changes clause. (*See, e.g.*, SOF ¶¶ 1-6)

LMA asserts that excessive O&A work required for Lots 3, 4, and 5 resulted in a total of 428,482 additional RERP production hours. The contractor agrees that it has been paid for the direct cost of this effort, but seeks $143,529,290 in additional compensation for disruption to the fixed-price RERP effort. It says that the parties' prior experience on the SDD contract served as the baseline for the instant contract, and that the actual level of RERP effort exceeded that expectation. The government denies that Lockheed Martin is entitled to further recovery or that appellant can prove there was a constructive change to the contract. (*See, e.g.*, SOF ¶¶ 32-35, 53)

22

We analyze separately the Air Force's several bases for its cross-motion for summary judgment (gov't mot. at 3) and begin by addressing the government's recurring thesis that Lockheed Martin unjustifiably relies on the measured mile approach, as the government's distaste for this alternative legal theory permeates its motion and perspective (*see, e.g.*, gov't mot. at 22-25; *see also* gov't reply & opp'n at 5-9). The government argues that LMA is not entitled to an equitable adjustment as asserted in Counts I and II of Lockheed Martin's complaint (*see infra* § III), and contends that the complaint's "Count III is precluded as a matter of law" (*see infra* § IV).

The government also seeks summary judgment with its contention that "[t]he claims in all three Counts were released by LMA by bilateral Contract modification" (gov't mot. at 3), including that the "cumulative impact" claim was released by Mod. P00301 (*id*. at 25-27). Because appellant's first cross-motion for summary judgment here rests upon the contradictory premise that "Contract Modification P00301 and its release do not bar Lockheed Martin's claims" (app. mot. & opp'n at 9, *see also id*. at 10-33), as a matter of judicial economy we decide these related cross-motions together in § V. We address appellant's second cross-motion that "No Other Contract Modifications [in addition to Mod. P00301] Released Lockheed Martin's Instant Claims" (app. mot. & opp'n at 33-44) in § VI.

## I. Standard of Review for Motions for Summary Judgment

Summary judgment is a salutary measure for resolving litigation where there are no disputed material facts, and the movant has proven that it is entitled to judgment as a matter of law. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987); Federal Rules of Civil Procedure (FED. R. CIV. P.) 56(a). The Board's duty in evaluating such motions is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id*. at 247-48 (emphasis in original).

Our assessment "necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits" (*Anderson v. Liberty Lobby Inc.*, 477 U.S. at 252), and we look to FED. R. CIV. P. 56 for guidance in deciding summary judgment motions (Board Rule 7(c)(2)). The "'facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts.'" *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986)

(citation omitted). As proponent of its claim, Lockheed Martin bears the "burden of proving the fundamental facts of liability and damages de novo." *Wilner v. United States*, 24 F.3d 1397, 1401 (Fed. Cir. 1994) (citing *Servidone Constr. Corp. v. United States*, 931 F.2d 860, 861 (Fed. Cir. 1991)) (further citations omitted).

While the movant must demonstrate there is no "genuine issue for trial," *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (citing FED. R. CIV. P. 56(e)), the nonmovant must "make a showing sufficient to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. In order to overcome a motion for summary judgment, the "party opposing the motion must point to an evidentiary conflict created on the record; mere denials or conclusory statements are insufficient." *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1116 (Fed. Cir. 1985) (citing *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 836 (Fed. Cir. 1984)).

When considering cross-motions for summary judgment, we "evaluate each motion on its own merits, taking care in each instance to view the evidence in favor of the non-moving party." *Almanza v. United States*, 935 F.3d 1332, 1337 (Fed. Cir. 2019) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255). "This standard is not changed when the parties bring cross-motions for summary judgment, each nonmovant receiving the benefit of favorable inferences." *Chevron U.S.A. Inc. v. Mobil Producing Tex. & N.M.*, 281 F.3d 1249, 1253 (Fed. Cir. 2002) (citing *Murphy Expl. & Prod. Co. v. Oryx Energy Co.*, 101 F.3d 670, 673 (Fed. Cir. 1996)).

II. The Government's Motion for Summary Judgment: Appellant Cannot Prove Liability, Causation, and Injury Using the Measured Mile Approach

An overarching theme in the government's motion for summary judgment is the alleged unsuitability of LMA's reliance on the measured mile approach to prove its claim. According to the government, Lockheed Martin's use of this legal theory, combined with appellant's lack of specific evidence for disruptive impacts and resulting costs, warrants judgment in the Air Force's favor. (*See, e.g.*, gov't mot. at 22-25; *see also* gov't reply & opp'n at 5-10)

The government argues as a general proposition that because Lockheed Martin did not keep or furnish more precise records with its claim, LMA has not met the requirements set forth in *Wilner*, 24 F.3d at 1401 and *Pyrotechnic Specialties Inc.*, ASBCA No. 57890 *et al.*, 17-1 BCA ¶ 36,696 at 178,704-05, *aff'd*, *Pyrotechnic Specialties, Inc. v. Sec'y of Def.*, 835 Fed. Appx. 607 (Fed. Cir. 2021). These decisions (among others) require a claimant to prove liability, causation, and injury to establish entitlement to an equitable adjustment (*Wilner*, 24 F.3d at 1401), and the government does not regard the measured mile as a competent way for doing so. (Gov't reply & opp'n at 4-11). The government observes that the contract does not

24

authorize use of this legal theory, as "LMA's 'measured-mile' pricing methodology is not set forth in any Contract term" (*id.* at 5 ¶ 7 of the government's "Statement of Undisputed Material Facts" (GUMF)).  The Air Force denies that Lockheed Martin has the "legal right" to use the "'measured-mile methodology,' instead of proof of 'actual costs'" to establish the "amount of an equitable adjustment" (gov't reply & opp'n at 6).

The government contends that appellant itself provides evidence that supports the government's motion:

> LMA's "measured mile" methodology does not reflect "actual cost" data supporting claimed "impacts" of O&A work on [firm fixed-price] work *because there is no such "actual cost" data in LMA's records for LMA's measured-mile method to reflect*.  That fact has now been made clear in numbered paragraph 13 of the sworn Declaration of Gregory Russ that LMA submitted as Exhibit 4 to LMA's Response [to the government's second set of cross-motions for summary judgment].

(Gov't reply & opp'n at 9) (emphasis in original)

The government focuses on ¶ 13 of Mr. Russ's declaration, in which he said it was "not possible" for Lockheed Martin to "separately track the additional RERP hours that resulted from the O&A work's impacts" or "account for slow-downs caused by performing out-of-sequence work or for having to work around the O&A work" (gov't reply & opp'n at 9 (citing app. mot. & opp'n, ex. 4 ¶ 13); *see also* SOF ¶¶ 33, 40).  According to the government, this "means that LMA's 'measured-mile' result was nothing more than a very unreliable statistical analysis of some kind, with no 'actual cost' basis from LMA's record system (because there were no charge codes as Mr. Russ admits for disruption impacts")" (gov't reply & opp'n at 9).

The government's disagreement with the measured mile approach is rooted in the contractor's purportedly unacceptable contrasting of periods of productivity with those that were interrupted by additional O&A work to prove that LMA was harmed, instead of presenting "actual costs" of the disruption.  Per the government, this includes appellant's alleged failure to demonstrate there was an "'injury' caused by an unauthorized contractual action of the government" or to tie specific MDRs to particular disruptions to work; it concludes from this that the contractor has not proven injury, liability, or causation.  (Gov't mot. at 22-23)  The government asserts that Lockheed Martin's "admitted failure" to maintain "contemporaneous records" demonstrating "how many of its claimed 428,482 hours of 'production labor inefficiency'" are attributable to "each of the 11,253 MDR 'changes' is not a

25

*justifiable inability to substantiate* the amount of [its] resultant injury by direct and specific proof." The government says this is a "*fatal inability to substantiate LMA's claim*" using "'actual cost' records" as required (gov't reply & opp'n at 7).

As legal support for impugning the measured mile approach, the government cites decisions in which the tribunal refused recovery to contractors that relied upon alternative legal theories to prove their claims and did not furnish "actual costs." These include *Dawco Constr. Co. v. United States*, 930 F.2d 872, 881 (Fed. Cir. 1991), *overruled by Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir. 1995) *on other grounds*, which found that contractor's use of the "jury verdict method"[7] to prove damages to be unacceptable in lieu of its providing "actual costs"; *see also* the government's citation to *Propellex Corp. v. Brownlee*, 342 F.3d 1335, 1338-39, 1341 (Fed. Cir. 2003) (the court disallowed the contractor's use of the "modified total cost method"[8] where the corporation failed to establish the impracticability of using actual costs). The Air Force also cites *Joseph Pickard's Sons Co. v. United States*, 532 F.2d 739, 742-44 (Ct. Cl. 1976), in which the contractor's attempted use of the "jury verdict method"[9] was rejected because it relied upon a finding of liability for costs and did not separately prove its damages. (Gov't reply & opp'n at 6-9)

---

[7] The jury verdict method can be used where there is "clear proof" that "injury exists," "there is no more reliable method for computing damages," and "the evidence is sufficient for a court to make a fair and reasonable approximation of the damages." It is to be used only "when other, more exact, methods do not apply." *Grumman Aerospace Corp. v. Wynne*, 497 F.3d 1350, 1358 (Fed. Cir. 2007) (citing *Dawco*, 930 F.2d at 880).

[8] For acceptable use of the "total cost method," the "contractor must prove: (1) the impracticability of proving its actual losses directly; (2) the reasonableness of its bid; (3) the reasonableness of its actual costs; and (4) lack of responsibility for the added costs" (*Propellex*, 342 F.3d at 1338 (additional citations omitted)). "The Modified Total Cost Method was derived from the Total Cost Method[,] which the Court described as a method of 'last resort' to be used in 'extraordinary circumstances where no other way to compute damages was feasible'" (*Optimum Servs.*, ASBCA No. 59952, 16-1 BCA ¶ 36,490 at 177,822 (citing *Servidone*, 931 F.2d at 861-62)). The modified total cost method requires an extra step in that the contractor must exclude costs for which it is responsible (*Propellex*, 342 F.3d at 1338).

[9] Although the jury verdict method is generally disfavored, it can be used under certain circumstances. The court has distinguished "between the measure of proof necessary to establish the fact that petitioner had sustained some damage, and the measure of proof necessary to enable the jury to fix the amount." This means that "The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages

26

*Analysis of the Government's Argument that Appellant Cannot Prove Liability,*
*Causation, and Injury Using the Measured Mile Approach*

Although the government's criticism of appellant's alleged inability to match the impact of claimed disruption to particular O&A work is a refrain that runs through the government's litigation approach, the government has not made its case that Lockheed Martin errs in relying upon the measured mile to do so. For example, in granting LMA's motion to compel discovery after the government withheld evidence based in part upon what the Air Force regards as shortcomings of this legal theory, the Board reminded the government that the "measured mile is not a disfavored approach before the Board; appellant will still need to provide proof of its claim" (*Lockheed Martin Aeronautics Co. (LMA)*, ASBCA No. 62209, 21-1 BCA ¶ 37,954 at 184,329).[10] Also, in deciding a previous set of cross motions for summary judgment in this appeal, the Board reminded the parties to adhere to precedent when arguing the parties' relative burdens of proof for recovery. *See LMA*, 22-1 BCA ¶ 38,112 at 185,130-31.

The ASBCA previously has "accepted the measured mile approach as an appropriate method of determining impact to productivity" (*States Roofing Corp.*, ASBCA No. 54860 *et al.*, 10-1 BCA ¶ 34,356 at 169,667 (citing, *e.g., Bay West, Inc.*, ASBCA No. 54166, 07-1 BCA ¶ 33,569 at 166,302-03)). The Board has said:

> Loss of productivity is generally established by expert testimony. As stated by the Court of Claims, "It is a rare case where loss of productivity can be proven by books and records; almost always it has to be proven by the opinions of expert witnesses." *Luria Brothers* [*& Co. v. United States*, 369 F.2d 701, 713 (Ct. Cl. 1966)]. Various methods have been used to quantify loss of productivity. The "measured mile" approach compares the productivity of an impacted period of the project with the productivity of an unimpacted period. *See, e.g., U. S. Industries, Inc. v. Blake Constr. Co.*, 671 F.2d 539, 547 (D.C. Cir. 1982). ("Such comparison of the cost of performing work in

---

which are definitely attributable to the wrong and only uncertain in respect of their amount." *Joseph Pickard's Sons*, 532 F.2d at 743.

[10] The Board granted appellant's motion to compel and rejected the government's assertion that it was unnecessary for it to provide discovery where the contractor purportedly lacked sufficient facts to prove its claim using the measured mile approach. As the Board stated, "It is not for the government to decide, especially at the discovery stage, whether appellant can be successful on its method of proof." *LMA*, 21-1 BCA ¶ 37,954 at 184,329.

different periods is a well-established method of proving damages"); *DANAC, Inc.*, ASBCA No. 33394, 97-2 BCA ¶ 29,184 [at] 145,152.

*Advanced Eng'g & Planning. Corp., Inc.*, ASBCA Nos. 53366, 54044, 05-1 BCA ¶ 32,806 at 162,325. As recently as 2019, we discussed the measured mile methodology in detail in the appeal of *King Aerospace, Inc.*, ASBCA No. 60933, 19-1 BCA ¶ 37,316. There, the concurring opinion by Judges Shackleford and Prouty applied the measured mile methodology, explained its proper use, and rejected argument that a contractor was required to track each and every cost, rather than apply the measured mile. 19-1 BCA ¶ 37,316 at 181,503. Although that decision was a concurrence, and thus not binding precedent under the Board's internal rules, its explanation of the measured mile methodology and its proper place is, nevertheless, instructive here and supports our consideration of that methodology, rather than its outright rejection as demanded by the government.

We distinguish the decisions relied upon by the government (including *Dawco*, *Propellex*, and *Joseph Pickard's Sons*) from the instant appeal, as the "jury verdict," "total cost," and "modified total cost" methods underpinning these rulings have different respective burdens of proof from the measured mile; each ruling was, in any event, a fact-specific determination. None of these decisions address the use of the measured mile approach or exclude its use. Although informative with respect to various ways damages might – or might not – be proven using alternative legal theories, these rulings do not support summary judgment here for the government.

### Conclusion

We deny the government's motion to the extent it is predicated on the premise that the measured mile approach cannot meet the requirements of *Wilner* and other precedent that require a claimant to prove liability, causation, and injury. Nor are we persuaded that appellant's alleged failure to "justify" its use of the measured mile legal theory is fatal to its appeal. The government did not establish how *Dawco* and *Joseph Pickard's Sons* require LMA to demonstrate a "justifiable inability" to provide direct proof, as these decisions cite the burden of proof for using the jury verdict method and not the measured mile.[11] Nor does the government adequately counter appellant's

---

[11] The court in *Dawco* noted that "The selection of the proper method for determining damages is a legal decision which [the Federal Circuit] review[s] non-deferentially on the basis of reasonableness" (citation omitted). It went on to say that "'it is equally well-settled that the amount of the recovery can only be approximated in the format of a 'jury verdict' where the claimant can demonstrate a *justifiable inability to substantiate* the amount of his resultant

assertions that its "claim establishes resultant injury using the measured-mile approach, which is based on Lockheed Martin's actual cost data, including actual hours worked and the applicable rates and factors from the claim period" (app. surreply at 3; *see also id.*8-10).

Lockheed Martin has demonstrated there are triable issues of fact that preclude summary judgment for the government. These include the degree of and manner in which the government required O&A work under the MDRs as well as the extent (if any) to which this increased effort disrupted and made more expensive the contractor's planned sequence of work.

III. The Government's Motion for Summary Judgment: "LMA Cannot Prove Entitlement to an Equitable Adjustment" for Count I, "Disruption – Constructive Changes" and Count II, "Overzealous Inspection"

In seeking summary judgment because Lockheed Martin allegedly "cannot satisfy its burden to prove the elements of an equitable adjustment for a 'constructive change,'" the government's motion jointly addresses "Counts I and II" of appellant's complaint. These separate but related counts are for "disruption – constructive changes" and "overzealous inspection" respectively. (Gov't mot. at 20-23[12]; *see also* overview in SOF ¶¶ 49-51)

Count I deals with the disruption allegedly resulting from the high volume of MDRs for Lots 3-5, which Lockheed Martin contends constructively changed the contract. According to LMA, "[t]he cost and schedule baselines" for the instant contract "relied on data from the parties' SDD contract." It says this prior experience "indicated that approximately 4,276 hours of O&A work per aircraft should be expected." (Compl. ¶ 131) While actual repairs for the first three aircraft refurbished under the RERP contract at issue approximated or slightly exceeded the anticipated learning curve for and volume of O&A work when compared to prior SDD contract levels, LMA says Lots 3 through 5 required "much higher volumes of O&A work" (compl. ¶¶ 132-33). Appellant asserts the increased work for these lots "disrupted Lockheed Martin's performance of the RERP work, adding 428,482 extra production hours and 277,038 support-factor hours to the RERP work" (compl. ¶ 134). The contractor asserts "entitle[ment] under the Contract's 'Changes' clause (FAR 52.243-4) to an equitable adjustment of the Contract price, reflecting its increased costs of performance" (compl. ¶ 135).

---

injury by direct and specific proof.'" *Dawco*, 930 F.2d at 880-81 (quoting *Joseph Pickard's Sons*, 532 F.2d at 742) (emphasis added in *Dawco*).

[12] There is some overlap between LMA's Count II regarding overzealous inspection as discussed in § III and appellant's Count III alleging government breach of the implied duty of good faith and fair dealing.

29

Count II alleges that "DCMA's over-inspection resulted in Lockheed Martin performing high volumes of O&A work" for Lots 3-5 (compl. ¶ 137). LMA maintains that these "overzealous inspections, and the resulting high volumes of O&A work [it] was required to perform, disrupted Lockheed Martin's performance . . . ." (compl. ¶ 138). The contractor again asserts it "is entitled under the Contract 'Changes' clause (FAR 52.243-4) to an equitable adjustment of the Contract price, reflecting its increased costs of performance" (compl. ¶ 139).

### A. The Government's Position

The government bases summary judgment for Count I on the argument that because funding was the only limit on the amount of O&A work that it could order Lockheed Martin to perform for Lots 3-5, there was no constructive change (gov't mot. at 21 citing GUMF ¶¶ 15, 16.a, 17.a, 18.a). The Air Force reasons that summary judgment is warranted and the appeal should be denied, because no government liability was established as required by *Wilner*, 24 F.3d at 1401 and *Pyrotechnic Specialties*, 17-1 BCA ¶ 36,696 at 178,703-04 (gov't mot. at 21-22).[13]

According to the government, Lockheed Martin has not linked the complained-of DCMA over-inspection in Count II with any resulting disruption to the contractor's planned work sequence. The government alleges that LMA has "admit[ted]that it cannot trace a single one of the claimed 428,482 'labor inefficiency' hours to any of the 11,253 MDRs for [Lots 3-5] or to any instance of alleged 'over-inspection' by DCMA . . . ." The Air Force asserts that the contractor "cannot prove a single dollar of 'injury' caused by an unauthorized contractual action of the government." (Gov't mot. at 22-23; *see also id*. at GUMF ¶¶ 3-4, 7, 10-30)

The Air Force sums its argument that appellant cannot prove entitlement to Counts I and II of its complaint by contending "there was <u>no 'Change'</u> to the 'volume of O&A work' <u>required</u> under the Contract for Lots 3 through 5." The government says "there was <u>no Contract term</u> that limited MDR 'volume' (and the resulting T&M and CPFF O&A hours) to any particular number(s) during LMA['s] performance of Lots 3 through 5 . . . ." It asserts that "[t]he only limit on the 'volume of O&A work' to be performed by LMA during Lots 3 through 5 was the 'Limitation of Cost' provisions in bilateral O&A funding modifications." (Gov't mot. at 21) (emphasis supplied by the government)

Concomitant with the government's position that Lockheed Martin cannot prove entitlement for Counts I and II is its assertion regarding "how imprudent LMA

---

[13] *See also* discussion in § II *supra* regarding *Wilner* and *Pyrotechnic Specialties*.

was in not capturing alleged MDR 'impacts' to performance costs [in Lots 3-5] from the first MDR issued." The Air Force maintains this is particularly the case where the H106 clause required Lockheed Martin to give notice of "any 'impact' claim within 90 days of completion of each MDR" and appellant failed to do so. (Gov't reply & opp'n at 5; *see also* gov't mot. at GUMF ¶¶ 29-30)

### B. The Contractor's Position

The contractor takes exception to the government's assertions that it cannot recover because the contract did not set a limit to the number of MDRs the government could require for Lots 3-5. Lockheed Martin emphasizes the contract's H106 clause, which it says specifically contemplates that O&A work is extra-contractual and indicates the contractor is entitled to damages for disruptive impact. LMA contends that "All O&A work under the H106 Clause was a change to the Contract scope. *See, e.g.* gov't R4, tab 3 at 75," which provides that "***Any*** work required to bring the aircraft to flightworthiness that is ***beyond the scope of this contract*** shall be accomplished on a Rapid Repair & Response (R3) basis, in accordance with the R3 clause, H106, or other mutually agreeable contractual arrangement." LMA stresses that "entitlement is not dependent upon the O&A work exceeding a specific limit, and thus none need be stated in either the H106 Clause or the Changes Clause." (App. mot. & opp'n at 47-48) (emphasis supplied by appellant)

Appellant also cites multiple instances which it maintains demonstrate that the government was made aware (*i.e.*, was put on "notice") that the contractor was experiencing disruption and had the right to recover for resulting injury. According to LMA, the events and correspondence it references establish that at a minimum, there is a genuine dispute of material fact regarding the notice requirement that precludes summary judgment for the government. (App. mot. & opp'n at 49-60)

*Analysis of the Government's Argument that LMA*
*Cannot Prove Entitlement for Counts I and II*

### 1. Constructive Changes and Relevant Contract Provisions

To prove a constructive change, the contractor must "show (1) that it performed work beyond the contract requirements, and (2) that the additional work was ordered, expressly or impliedly, by the government." *Bell/Heery v. United States*, 739 F.3d 1324, 1335 (Fed. Cir. 2014) (citations omitted). As required by "[e]lementary principles of contract interpretation," we read the contract "as a harmonious whole," giving effect to "all provisions" with the goal of rendering none "'useless, inexplicable inoperative, void, insignificant, meaningless or superfluous.'" *ECI Const., Inc.*, ASBCA No. 54344, 05-1 BCA ¶ 32,857 at 162,807 (quoting *Hol-Gar Mfg. Corp. v. United States*, 351 F.2d 972, 979 (Ct. Cl. 1965) (further citations omitted)).

31

The Air Force misinterprets the contract, including the reach of the limitation on cost requirements in bilateral O&A funding modifications and those that added CLINs: those restrictions do not preclude a contractor's recovery where the government orders it to perform qualifying work. The government fails to fully evaluate the importance of the H106 and Changes clauses, which permit recovery for certain additional work, even after these were raised by Lockheed Martin in opposing the government's motion. (*See, e.g.*, SOF ¶¶ 3, 5-7) Nor does the government account for the baseline level of work that LMA was told to anticipate in SOW ¶ 3.2.1, but which appellant maintains the government exceeded in the RERP contract. This part of the SOW contemplated the possibility of extra-contractual effort, and the need to compensate the contractor for "work required to bring the aircraft to flight worthiness that is beyond the scope of this contract" pursuant to "the R3 clause, H106, or other mutually agreeable contractual arrangement" (*see* SOF ¶ 12). (*See, e.g.*, gov't reply & opp'n *passim* and gov't surreply *passim*)

For purposes of deciding this motion, we agree that appellant has raised triable issues concerning provisions of the contract that recognize entitlement to an equitable adjustment for cost and/or time for changed work. These include the SOW and H106 clauses as well as FAR 52.243-01, CHANGES – FIXED-PRICE (AUG 1987). We disagree with the government that the absence of a cap on the number of MDRs means that the level of O&A work actually performed cannot constitute a constructive change and find the Air Force's reliance on funding restrictions insufficient to warrant its favorable judgment. Finally, we agree appellant raised triable issues regarding whether it timely placed the government on notice of the operative facts of its claim (*see* SOF ¶¶ 5-6, 58).

### 2. Proof of "Disruptive Impact" and "Direct Costs"

The government is correct that the contract requires LMA to document its actual costs (SOF ¶ 15). However, it does not sufficiently counter (*see, e.g.*, gov't reply & opp'n *passim*, and gov't surreply at 4, 7-8) decisions relied upon by appellant to establish that the Board and courts have recognized that contractors are not required to trace each disruptive impact in manner that the Air Force here asserts (app. mot. & opp'n at 49, 51-55). We agree that these opinions show that the contractor does not at this juncture have to "trace, on an hour-by-hour basis, each of the additional 428,482 RERP production hours back to a specific MDR among the over 12,000 MDRs on Lots 3-5" (app. mot. & opp'n at 51 (citing *States Roofing*, 10-1 BCA ¶ 34,356 at 169,668 ("Given the pervasive extent and the nature of the differing site conditions and changes on this roofing contract, it is readily apparent to us that it is impracticable for [States Roofing] to tie its losses directly to each of the specific events that cause disruption as the Navy asserts it must."); *Advanced Eng'g & Planning Corp., Inc.*, 05-1 BCA ¶ 32,806 at 162,325; *Luria Bros. & Co. v. United States*, 369 F.2d 701, 713 (Ct. Cl. 1966))).

32

As appellant correctly observes, "at the summary judgment stage, causation need only 'be established by a demonstration that some damages resulted' from the Government actions" (app. mot. & opp'n at 52 (citing *Northrop Grumman Corp.*, ASBCA Nos. 52785, 53699, 03-2 BCA ¶ 32,280 at 159,711)). Lockheed Martin also relies upon *Elec. Boat Corp.*, ASBCA No. 58672, 19-1 BCA ¶ 37,257 at 181,323, for the proposition that "deposition assertions of generalized disruption [are] sufficient [for a nonmovant] to survive [a] summary judgment motion on entitlement" (app. mot. & opp'n at 52). We agree.

### *Conclusion*

We draw all reasonable inferences in favor of the nonmovant (*Chevron*, 281 F.3d at 1253) and follow established elements of proof required for a constructive change (*Bell/Heery*, 739 F.3d at 1335). We conclude there are triable issues of fact that preclude summary judgment for the government on the bases it raised for Counts I and II.

IV. The Government's Motion for Summary Judgment: Appellant's "Count III (Breach of Implied Duty of Good Faith and Fair Dealing) Claim Fails as a Matter of Law"

Count III of Lockheed Martin's complaint alleges that the government violated its implied duty of good faith and fair dealing (compl. at 24-25). The contractor attributes this to DCMA's requiring LMA to allegedly "make unnecessary repairs of legacy discrepancies" that "contributed to the excessively high volumes of O&A work added to the RERP Contract" (compl. ¶ 141). Appellant asserts that the government "imposed overly restrictive flight-acceptance criteria"; "applied an inappropriate good-as-new standard in determining whether to require the repair of legacy discrepancies"; "required repairs" that were "not necessary for airworthiness or safety of flight" or "to support or allow completion of the RERP upgrade work"; and "applied standards that were more stringent than it had applied for the first three aircraft under the RERP Contract" or "would normally be expected for an upgrade program of this type" (compl. ¶¶ 142-148). These are among the actions relied upon by the contractor to substantiate its contention that the government "vitiated Lockheed Martin's reasonable expectations in the performance of the contract" and caused it "to experience inefficient learning curves and incur $143,529,290 in unanticipated disruption costs" (compl. ¶ 154).

The government makes multiple arguments to support its motion with respect to Count III, including that the Board lacks "subject matter jurisdiction" (gov't mot. at 23 n. 3); LMA failed to detail government actions that breached its duty of good faith and fair dealing (*id*. at 24-25); and "Count III is precluded as a matter of law and should be

33

dismissed by the Board" in accordance with the decision in *BGT Holdings LLC v. United States*, 984 F.3d 1003 (Fed. Cir. 2020) (gov't mot. at 25). We address these in turn and find that none support summary judgment for the government.

### A. The Government Alleges the Board Lacks "Subject Matter Jurisdiction" over Count III

The government argues the Board's alleged lack of jurisdiction over LMA's Count III in a footnote and not the body of its motion.[14] Quoted in full, the government asserts that the Board lacks "subject matter jurisdiction" over Count III because:

> LMA's certified claim (R4, tab 2) <u>did not present a breach claim</u> for decision by a [CO]. LMA's certified claim only presented an "excessive O&A hours" claim for $143,529,290 for "… <u>an equitable adjustment</u> of the contract under the <u>Changes clause</u>…" (Gov't R4, tab 2 at 5 and 26) (emphasis added); and Gov't R4, tab 2 at 9 ("While the Government can unilaterally impose such increased requirements, the <u>Changes clause</u> entitles the contractor to <u>an equitable adjustment</u> for any resulting additional costs of performance.") (emphasis added).

(Gov't mot. at 23 n.3) (emphasis supplied by the government)

The government cites no legal authority to support summary judgment on this basis either in its motion or subsequent filings (*see, e.g.*, gov't mot. *passim*; gov't reply & opp'n *passim*; gov't surreply *passim*).

Lockheed Martin maintains that Count III of its complaint is properly before the Board as an alternative legal theory based upon operative facts that were presented to the CO in its claim. Among the decisions relied upon by LMA are *Lockheed Martin Aircraft Ctr.*, ASBCA No. 55164, 07-1 BCA ¶ 33,472 at 165,934 ("The assertion of a

---

[14] We address the government's jurisdictional assertion in n.3 due to its gravity, but caution that parties making arguments in footnotes risk having these disregarded as improperly raised. As the Federal Circuit has stated, "Arguments raised only in footnotes are waived," *Otsuka Pharm. Co., Ltd. v. Sandoz, Inc.*, 678 F.3d 1280, 1294 (Fed. Cir. 2012) (citing *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006)). The court may (or may not) exercise its "discretion to consider improperly raised arguments . . . ." *Otsuka*, 678 F.3d at 1294 (citation omitted). The ASBCA is of the same view.

new legal theory of recovery, when based upon the same operative facts as the original claim, does not constitute a new claim" (citations omitted)) and *Odyssey Int'l, Inc.*, ASBCA No. 62062, 20-1 BCA ¶ 37,510 at 182,213 ("'Materially different claims whether materially different factually or legally will necessitate a focus on a different or unrelated set of operative facts'" (internal citations omitted). (App. mot. & opp'n at 66-67)

The contractor quotes particular "operative facts" articulated in its certified claim "that support Count III" of its complaint:

> (a) DCMA required unnecessary repairs, which contributed to excessively high volumes; (b) DCMA imposed overly restrictive flight-acceptance criteria; (c) DCMA applied standards that were more stringent than applied during the SDD program; (d) DCMA applied standards that were more stringent than it applied under the first three aircraft; (e) DCMA applied standards that were more stringent than would be applied on an upgrade program; (f) the Government failed to cooperate to curtail the excessive O&A work.

(App. mot. & opp'n at 67-68 (citing compl. at 24-25; app. supp. R4, tab 408 at 10, 14, 18-19))

*Analysis of the Government's Argument Regarding*
*Subject Matter Jurisdiction over Appellant's Count III*

Being advanced by footnote, the government's argument does not specify whether it is being brought under the rubric of summary judgment or as a motion to dismiss. Since it is a jurisdictional challenge, we analyze it under the standards that would apply to a motion to dismiss under FED. R. CIV. P. 12(b)(1). Hence, the burden of proof is on appellant to prove jurisdiction through a preponderance of the evidence. *See, e.g., Tetra Tech EC, Inc.*, ASBCA Nos. 62449, 62450, 21-1 BCA ¶ 37,900 at 184,054 (citations omitted); *see also Gen. Mills, Inc. v. United States*, 957 F.3d 1275, 1284 (Fed. Cir. 2020)); *Reynolds v. Army Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).[15]

---

[15] Distinctions between motions made under FED. R. CIV. P. 56 and FED. R. CIV. P. 12(b)(1) are discussed in the Board's ruling on the parties' first set of motions for summary judgment. *See, e.g., Lockheed Martin*, 22-1 BCA ¶ 38,112 at 185,123, *also id.* n.16 regarding the helpful guide in *Kamran Zaland Supplies and Servs.*, ASBCA No. 61339, 19-1 BCA ¶ 37,475 at 182,049 (citing *L-3*

Although the Air Force does not cite the CDA, federal or ASBCA rules, or any legal precedent in making this argument, we understand the gravamen of its assertion to be that LMA failed to comply with 41 U.S.C. § 7103(a), which requires prior submission of a contractor's claim to the CO for decision as a jurisdictional predicate. If the government is correct, the Board is without jurisdiction over this portion of the contractor's complaint, as the "content of the claim is crucial, as it establishes the bounds of the appeal" (*Northrop Grumman Sys. Corp. Space Sys. Div.*, ASBCA No. 54774, 10-2 BCA ¶ 34,517 at 170,230 (citing *J.S. Alberici Constr. Co. & Martin K. Eby Constr. Co. (JV)*, ENG BCA No. 6178, 98-2 BCA ¶ 29,875 at 147,917, *aff'd, Caldera v. Alberici*, 153 F.3d 1381 (Fed. Cir. 1998))).

Although the government is correct that Lockheed Martin's claim was not couched in terms of "breach," this does not mean that the Board lacks jurisdiction over Count III of appellant's complaint. The proper inquiry into the Board's jurisdiction is whether appellant adequately informed the government of the nature of and basis for its certified claim dated October 1, 2018 (*see* SOF ¶¶ 32, 35, 41-47).

The requirement that the CO be properly informed of a claim is discussed in detail in the Board's ruling on the parties' first set of cross-motions for summary judgment. *See, e.g., LMA*, 22-1 BCA ¶ 38,112 at 185,123-24. To summarize, the Board "appl[ies] a common sense analysis" in ascertaining whether there is "an extra-jurisdictional, new claim" versus the articulation of "an alternative legal basis for an existing claim." *Id*. at 185,124. We have jurisdiction where a party simply asserts a "new legal theory of recovery, when [it is] based on the same operative facts as included in the original claim . . . ." *Id*. (citing *Penna Group, LLC*, ASBCA No. 61640 *et al*., 21-1 BCA ¶ 37,917 at 184,150-51; *Trepte Constr. Co.*, ASBCA No. 38555, 90-1 BCA ¶ 22,595 at 113,385-86).

Jurisdiction is undisturbed and there is not a "new" claim where it is necessary that the tribunal only "review the same or related evidence." *Placeway Constr. Corp. v. United States*, 920 F.2d 903, 907 (Fed. Cir. 1990); *see also Lee's Ford Dock v. Sec'y of the Army*, 865 F.3d 1361, 1369 (Fed. Cir. 2017).[16] This is the case here: we

---

*Commc'ns Integrated Sys. L.P.*, ASBCA Nos. 60713, 60716, 17-1 BCA ¶ 36,865 at 179,625; 2 Moore's Federal Practice 3D §12.30[3]).

[16] To be sure, there is recent Federal Circuit law suggesting that a significantly different legal theory may necessitate a new claim. *See Tolliver Grp., Inc. v. United States*, 20 F.4th 771, 777 (Fed. Cir. 2021). But we read this to be a reflection that a different enough legal theory might necessitate a review of different facts making for a materially different analysis by the CO. *See BCC-UIProjects-ZAAZTC Team JV*, ASBCA No, 62846, 22-1 BCA ¶ 38,119

find that Lockheed Martin has established that its assertion of "breach of the implied duty of good faith and fair dealing" is an alternative legal theory of recovery for facts that were placed before the CO in LMA's certified claim (*see, e.g.*, app. mot. & opp'n at 67-68 (citing compl. at 24-25; app. supp. R4, tab 408 at 10, 14, 18-19)).

## *Conclusion*

Lockheed Martin has successfully rebuffed the government's challenge to our subject matter jurisdiction. The Board has subject matter jurisdiction over Count III of LMA's complaint. Lockheed Martin's claim set forth the operative facts of this alternative legal theory to the CO and that portion of the appeal is properly before us.

### B. *The Air Force Argues that Appellant Failed to Detail Actions that Breached the Government's Implied Duty of Good Faith and Fair Dealing*

According to the Air Force, LMA provided inadequate information regarding the specific acts which the contractor regards as a breach of the government's duty of good faith and fair dealing. The government relies upon LMA's response to interrogatory no. 5 of the government's "Third Set of Interrogatories and Third Request for Production of Documents," in which appellant was asked to "[e]xplain in detail each of the Government actions" that the contractor's complaint contends "constituted a breach of 'the implied duty of good faith and fair dealing.'" The interrogatory also sought "the specific amount and calculation of the 'breach damages' that LMA contends to be entitled to in paragraph 156 of the Complaint." The government cites Lockheed Martin's response to the interrogatory, which stated "that the Government's failure to take corrective measures to effectively reduce the extent of O&A work that Government personnel required from Lockheed Martin prior to the execution of Modification P00301 [Gov't R4, tab 12] was a further breach of the duty of good faith and fair dealing." (Gov't mot. at 24 citing ex. R-6 at 6-7)

The Air Force contends that appellant's response to interrogatory no. 5 seeking a "detailed explanation" essentially told the government to "figure out for itself the specific breach actions and amount/calculation of damages to LMA for any such breach" (gov't mot. at 24-25).

### *Analysis of the Government's Argument that Appellant Failed to Detail Government Actions That Breached Its Implied Duty of Good Faith and Fair Dealing*

The parties' duty of good faith and fair dealing with one another may be implied, but it is a very real obligation, and its importance has been reinforced

---

at 185,177. Here, we find that the CO's analysis of LMA's claim would not have been substantially different under either legal theory.

37

by the Federal Circuit and the Board. As the ASBCA has held:

> This is a fundamental responsibility, as "[e]very contract imposes upon each party an implied duty of good faith and fair dealing in its performance and enforcement." *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014) (quoting RESTATEMENT (SECOND) OF CONTRACTS §205 (1981)). This obligation is breached when a party "fails to abide by this implied duty, which includes 'the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract.'" *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019) (citing *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005)).

> This legal theory carries a lesser evidentiary burden than establishing that the government acted in bad faith. It is unnecessary that its proponent show intent to injure, as evidence of "specific[ly] targeting" a contractor is not "a requirement for a showing of breach" of the duty of good faith and fair dealing. *Metcalf*, 742 F.3d at 993. The requirement of good faith and fair dealing includes the duty to cooperate, as "[w]hat is promised or disclaimed in a contract helps define what constitutes 'lack of diligence and interference with or failure to cooperate in the other party's performance.'" *Id*. at 991 (citing *Malone v. United States*, 849 F.2d 1441, 1445 (Fed. Cir. 1988)).

*Satterfield & Pontikes Constr., Inc*., ASBCA Nos. 59980, 62301, 21-1 BCA ¶ 37,873 at 183,909.

*Conclusion*

Lockheed Martin provided sufficient evidence of disputed material facts, which we construe in its favor as non-movant (*see, e.g.*, *Ricci*, 557 U.S. at 586 (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007); Fed. R. Civ. P. 56); *see also* SOF ¶¶ 32, 35-40). There are "triable issues regarding whether the government breached its duty of good faith and fair dealing toward the contractor" that foreclose summary judgment on the government's behalf. *Satterfield & Pontikes*, 21-1 BCA ¶ 37,873 at 183,909-10 (citing, *e.g., SIA Constr. Inc*., ASBCA No. 57693, 14-1 BCA ¶ 35,762 at 174,986 (citing *Coastal Gov't Servs., Inc*., ASBCA No. 50283, 99-1 BCA ¶ 30,348 at 150,088)).

*C. The Government's Argument that the Federal Circuit's Decision in BGT Holdings LLC v. United States Justifies Summary Judgment in Its Favor with Respect to Count III*

According to the government, Count III of appellant's complaint should be dismissed because "LMA now admits that Count III of the Complaint for alleged breach of contract is based on the same facts and seeks the same amount claimed as an equitable adjustment in Counts I and II under the contract['s] Changes clause." The government cites *BGT Holdings LLC v. United States*, 984 F.3d 1003 (Fed. Cir. 2020), which the government characterizes as "affirming the dismissal of a breach of good faith and fair dealing claim as legally preempted where the contract contained a clause permitting an equitable adjustment claim for the same amount at issue." (Gov't mot. at 25) The government relies upon this decision as the sole authority for this contention (*id*. at 24-25).

<u>*Analysis of the Government's Reliance on BGT to Justify Summary Judgment*</u>

Although the government does not designate the relevant portion of *BGT* that "require[s] dismissal of Count III" because Lockheed Martin seeks the same amount and "incorporate[es] the same facts from Counts I and II" (*see, e.g.*, gov't mot. at 25; gov't reply & opp'n at 10), it appears that the Air Force might be relying upon the following paragraph in that opinion:

> Although BGT relies on the doctrine of good faith and fair dealing as a separate ground for relief, that claim is based on the same set of facts as BGT's other claims. The contract itself defines the parties' respective rights in light of those facts. If the contract had expressly authorized the Navy to withdraw the GFE without consequence, the parties' rights would be settled by the contract, and the duty of good faith and fair dealing would have no role to play in resolving this dispute. Because we interpret the contract to provide BGT a mechanism for obtaining compensation for the withdrawal of GFE, BGT's rights are likewise governed by the contract, and the doctrine of good faith and fair dealing cannot be employed to read just those rights. We therefore affirm the dismissal of BGT's claim of breach of good faith and fair dealing.

*BGT*, 984 F.3d at 1016-17.

If we correctly discern that portion of *BGT* relied upon by the Air Force (and even if the government had something else in mind that it did not disclose), this does not support summary judgment for the government. In *BGT*, the contractor sued after the Navy withheld items listed as government-furnished equipment (GFE) in the contract but did not provide compensation for its value. The court dismissed BGT's assertions of breach of the duty of good faith and fair dealing, which is an implied contractual obligation, because the actions complained of were explicitly governed by contract terms. A particular contract clause gave the government the right to withhold or decrease the listed GFE; the same clause also gave the contractor the remedy of seeking an equitable adjustment in the event the government modified its GFE commitments. *BGT*, 984 F.3d at 1016-17.

As the Federal Circuit explained, BGT could not rely upon breach of the implied duty of good faith and fair dealing where the very act complained of – that of the government's withholding GFE – was specifically authorized by its contract with the Navy. Where "[t]he contract unquestionably gives the Navy the right to decrease or withdraw GFE[,] BGT cannot use the doctrine of good faith and fair dealing to complain of the very conduct that the contract expressly permits." *Id.* at 1016. The court quoted *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 831 (Fed. Cir. 2010) for the proposition that "The implied duty of good faith and fair dealing cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions." In short, the implied duty of good faith and fair dealing was not breached where a party took an action specifically authorized under the contract and for which a remedy was provided. The same clause that granted the government the right to withhold the GFE gave BGT the remedy of seeking an equitable adjustment if the Navy did so. *BGT*, 984 F.3d at 1016.

The court said nothing in *BGT* about the general right of a party to seek redress under alternative legal theories of recovery (*see BGT,* 984 F.3d 1003 *passim*), which is the way that we view LMA's arguments on good faith and fair dealing. The Federal Circuit repeatedly has recognized the right of a contractor to appropriately raise additional arguments; *see supra* § III, discussing, *inter alia*, *Lee's Ford Dock*, 865 F.3d at 1369 (Fed. Cir. 2017) and *Placeway*, 920 F.2d at 907 (Fed. Cir. 1990); *see also Scott Timber Co. v. United States*, 333 F.3d 1358, 1365 (Fed. Cir. 2003), which "does not require ridged [sic] adherence to the exact language or structure of the original administrative CDA claim" in determining whether the proponent lodged a claim that exceeds the one presented to the CO for decision or "merely assert[ed] differing legal theories for that recovery."

In the appeal at hand, the government unsuccessfully seeks summary judgment by attempting to expand the reach of a fact-specific ruling that limited BGT's available causes of action. We disagree that *BGT* stands for the abrogation of the court's

40

longstanding recognition that parties may properly plead more than one alternative legal theory, as Lockheed Martin has here.[17]

*Conclusion*

Under the standards established for motions for summary judgment (*see* § I, *supra*) and motions to dismiss, the government failed to prove that it is entitled to judgment on the bases it asserted with respect to Count III. We deny the government's motion for summary judgment under the arguments advanced regarding LMA's assertions that the government breached its duty of good faith and fair dealing.

V. The Parties' Cross-Motions for Summary Judgment Regarding Whether the Contractor's $143,529,290 "Cumulative Impact" Claim Was Released as a Consequence of Bilateral Contract Modification P00301

We consider together the parties' cross-motions for summary judgment that concern whether appellant released its cumulative impact claim by bilaterally agreeing to Mod. P00301. According to the Air Force, "even if LMA could prove (which it cannot) entitlement to a $143,529,290 equitable adjustment of the Contract price for alleged 'cumulative impact' to RERP fixed-price CLINs caused by O&A work, any such claim was released by LMA pursuant to bilateral [Mod.] P00301, signed by LMA on September 30, 2014" (gov't mot. at 25). Appellant's opposition to the government's motion, which is also described as its first cross-motion for summary judgment, urges a different result. It argues that "Contract Modification P00301 and its release do not bar Lockheed Martin's claims [because the release therein] is limited to claims that arise out of or are in connection with the changes effected by [Mod.] P00301." (App. mot. & opp'n at 9)

The release in Mod. P00301 states that it is specifically limited to "any and all" government "liability under the contract for further claims or equitable adjustments arising out of or in connection with the changes effected hereby." Further, "All other contract terms and conditions remain unchanged and are in full force and effect as a result of this modification." (R4, tab 12 at 3; *see also* SOF ¶ 31) It appears the government is more focused on the second sentence of the release (*see* gov't mot. at 25-27) whereas Lockheed Martin is more centered on the first sentence (*see* app. mot. & opp'n at 16-33).

---

[17] Of course, if we later find that the implied duties in question were all governed by the contract, we will dismiss this count as required by *BGT*, but we have not reached that stage yet.

41

*A. The Government's Position*

The government contrasts Mod. P00301's "release by LMA, without any included reservation of claims of any type," with appellant's release in Mod. P00178. The Air Force contends that the latter "was unambiguous and precludes LMA's 'cumulative impact' claim in accordance with governing precedent – *Bell BCI Co. v. United States*, 570 F.3d 1337 (Fed. Cir. 2009)." (Gov't mot. at 26) The Air Force likens the facts in the instant appeal to those in *Bell BCI*, in which the court denied the contractor's subsequent claim for breach of contract based on cumulative impact because it was precluded by the relevant modification's unambiguous release of claims (*id*. at 26-27).

The Air Force clarified its focus on the second sentence of the release in Mod. P00301, which says "*All other contract terms and conditions remain unchanged and are in full force and effect as a result of this modification*" (gov't reply & opp'n at 11) (emphasis added by the government). The government contends that "Any such potential O&A 'constructive change' claims for an equitable adjustment to increase the firm-fixed-price CLINs [for Lots 3-5] being contemplated by LMA on September 11, 2014 were released by the unambiguous last sentence . . . without any reservation of rights to file O&A 'disruption' claims . . . ." According to the government, appellant's stance that its September 30, 2014 claim was not released by this language "renders that sentence meaningless." (*Id*. at 12)

The Air Force dismisses as irrelevant appellant's contention that the government's continued review of LMA's claim following the execution of Mod. P00301 precludes the government's release defense. The government does not dispute that it did so, but asserts that this "do[es] not change the rules of interpretation of unambiguous release language." (Gov't reply & opp'n at 12-13 (citing *Bell BCI*, 570 F.3d at 1341; *Pyrotechnic Specialties*, 17-1 BCA ¶ 36,696 at 178,702-03))

The government also posits a temporal requirement for assessing the relevance of the government's consideration of a post-release claim. It cites *England v. Sherman R. Smoot Corp*., 388 F.3d 844 (Fed. Cir. 2004) for the proposition that "the government's consideration of the claim is not considered relevant to the proper interpretation of the bilateral release in the contract that predated the filing of the claim." The government also relies on *Sam Bonk Uniform & Civilian Cap Co., Inc. v. United States*, 230 Ct. Cl. 926 (1982) and *Loral Corp. Def. Sys. Div.-Akron*, ASBCA No. 37627, 92-1 BCA ¶ 24,661 to support its contention. (Gov't reply & opp'n at 12-14) (emphasis added by the government)

### B. The Appellant's Position

Lockheed Martin argues that "By its plain meaning, the P00301 release is limited to claims that arise out of or are in connection with the changes effected by" that modification. Appellant additionally asserts that precedent establishes that "the Government cannot later assert that [a] release bars a contractor's claims" where "the Government considers a claim *after* a purported release." It maintains that "all extrinsic evidence establishes that the parties did not intend P00301 to release the claims," and that "neither party intended or understood P00301's release to have the interpretation that Government litigation counsel now advances." Finally, LMA alleges that "any ambiguity" in the release would be construed against the government as its drafter under the doctrine of *contra proferentem*. (App. mot. & opp'n at 9)

### *Analysis of the Parties' Cross-Motions for Summary Judgment Predicated upon the Release in Contract Modification P00301*

We agree with Lockheed Martin that the unambiguous release in Mod. P00301 supports its interpretation of the contract and not that of the government. This release does not encompass the claims at issue, which remain before us.

### A. Proper Interpretation of the Contract as a Harmonious Whole Does Not Support the Government's Cross-Motion

Properly interpreting the release in Mod. P00301 does not mean looking at only a portion of the modification, or reading it in isolation, as the government does. Rather, we construe the release by considering the modification as an integrated whole and as part of the overall contract. This is consistent with the well-established rules of contract interpretation:

> "Contract interpretation begins with the language of the written agreement." *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004). "'In contract interpretation, the plain and unambiguous meaning of a written agreement controls.'" *Hercules Inc. v. United States*, 292 F.3d 1378, 1380–81 (Fed. Cir. 2002) (quoting *Craft Mach. Works, Inc. v. United States*, 926 F.2d 1110, 1113 (Fed. Cir. 1991)). We must interpret a contract "'in a manner that gives meaning to all of its provisions and makes sense,'" *Langkamp v. United States*, 943 F.3d 1346, 1353 (Fed. Cir. 2019) (quoting *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996)), and we seek to "'avoid [] conflict or surplusage of [the contract's] provisions,'" *United Int'l Investigative Servs. v.*

> *United States*, 109 F.3d 734, 737 (Fed. Cir. 1997) (quoting
> *Granite Constr. Co. v. United States*, 962 F.2d 998, 1003
> (Fed. Cir. 1992)).  *See also NVT Techs*., 370 F.3d at 1159
> (explaining that interpretations should "harmonize and
> give reasonable meaning" to all parts of the contract, rather
> than "leave [] a portion of the contract useless,
> inexplicable, void, or superfluous").  Contract provisions
> should not "be construed as being in conflict with [one]
> another unless no other reasonable interpretation is
> possible."  *Hol-Gar Mfg. Corp. v. United States*, 351 F.2d
> 972, 979 (Ct. Cl. 1965).

*NOAA Maryland, LLC v. Adm'r, of Gen. Servs. Admin*., 997 F.3d 1159, 1165-66 (Fed. Cir. 2021).

Mod. P00301 is specific about the changes it makes to the contract.  It modified "CLIN 6019" by increasing funding in the amount of $9,893,429.10 of FY12 3010 appropriations for aircrafts (6-2 to 6-4)"; established "CLIN 6020 to provide funding in the amount of $23,084,667.90 of FY14 3010 appropriations [sic] for aircrafts (6-5 to 6-11)"; modified "Special Contract Requirement H106, 'Rapid Repair and Response (R3) (AUG 2014)'" to incorporate revised procedures; and modified "Special Contract Requirement H139, 'Joint USAF and LM Action Plan Implementation' AUG 2014" to update procedures.  (R4, tab 12 at 3)  The change to the H139 Clause included an express limit of 400 MDRs per aircraft (averaged per lot) for Lots 6 and 7 (*id*. at 12-13).  Mod. P00301 also described efforts to improve the workflow, including the interactions of the Government Advisory Team and the on-site representatives (*id*. at 14).  Mod. P00301 did not establish any MDR limits for Lots 3, 4, and 5, nor did it designate specific O&A repairs the government could require or the level of effort to achieve that work (*id*. *passim*; *see also* SOF ¶¶ 24-26, 29-30).

The release in Mod. P00301 is keyed to the work required and contract changes brought about by that discrete modification (*see* SOF ¶ 31).  The first sentence of the release reinforces that finite scope:  "This supplemental agreement constitutes a full and equitable adjustment and the Contractor releases the Government from any and all liability under the contract for further claims or equitable adjustments <u>arising out of or in connection with the changes effected hereby</u>."  This limiting language, as well as the recitation of changes wrought by this modification, puts into context the scope of the second sentence in the release, which states:  "All other contract terms and conditions remain unchanged and are in full force and effect as a result of this modification."  There is no release of claims stated in the second sentence of Mod. P00301; rather, the verbiage indicates that the reach of this modification does not affect unrelated contractual matters.  (R4, tab 12 at 3) (emphasis added)

44

*B. The Federal Circuit's Decision in Bell BCI Co. v. United States Does Not*
   *Support the Government's Interpretation of the Release in Mod. P00301*

Nor do we agree with the government that its interpretation of the contract is supported by the decision in *Bell BCI*. The court held there that the parties' bilateral release specifically barred the contractor's subsequent claims that were "attributable to" the subject modification (570 F.3d at 1341). The decision in *Bell BCI* rested upon a contract modification that contained the following release:

> The modification agreed to herein is a fair and equitable adjustment for the Contractor's direct and indirect costs. This modification provides full compensation for the changed work, including both Contract cost and Contract time. The Contractor hereby releases the Government from any and all liability under the Contract for further equitable adjustment attributable to the Modification.

570 F.3d at 1339 (emphasis added)

The court emphasized that "The language plainly states that Bell released the government from *any and all* liability for equitable adjustments attributable" to the subject matter of the modification at issue. *Bell BCI*, 579 F.3d at 1341 (emphasis in original).[18]

Unlike the court in *Bell BCI*, the Air Force here does not rely upon the changes brought about by the modification in the instant contract (*cf.*, gov't mot. at 25-27). Rather, the government attempts to foreclose any and all Lockheed Martin claims that existed as of the date Mod. P00301 was executed, despite language in the first sentence of the release that sets boundaries for that particular modification. The government maintains that the statement that "[a]ll other contract terms and conditions remain unchanged and are in full force and effect as a result of this modification" is broad enough to extinguish any contractor claim existing on that date. (*Id*. at 26)

The government offers no evidence (nor does it even contend) that the claims it seeks to block are related (or "attributable") to the contract changes that are the subject of Mod. P00301 (*see, e.g.*, gov't mot. *passim*). These changes primarily concern funding, issues relating to Lots 6 and 7, interactions between the government and the

---

[18] The Federal Circuit also remanded the matter "to the Court of Federal Claims so it can determine which of Bell's cumulative impact claims, if any, are 'attributable to' modifications *other than* those modifications that contain the release language" in question. *Bell BCI*, 579 F.3d at 1342 (emphasis in original).

contractor including the GAT and OSRs, clauses H106 and H139, and limiting the number of MDRs for certain aircraft; the modification does not mention Lots 3-5 (*see* SOF ¶¶ 24-26, 29-30). Instead, the Air Force focuses upon the fact that this modification was executed on September 30, 2014, which was days after LMA gave notice "of its 'reservation of rights to a disruption-related equitable adjustment'" (gov't reply & opp'n at 12).

The government maintains that "Any such potential O&A 'constructive change' claims for an equitable adjustment to increase the firm-fixed-prices of CLINs 3004, 4004 and 5004" that LMA had in mind "on September 11, 2014 were released by the unambiguous last sentence of paragraph 3, RELEASE OF CLAIMS on September 30, 2014 … without any reservation of rights to file O&A 'disruption' claims." The government says that LMA's interpretation renders that last sentence meaningless. (Gov't reply & opp'n at 12)

*Conclusion*

Lockheed Martin properly interprets the unambiguous[19] release in Mod. P00301. The government errs in contending that this modification bars any claim existing as of September 30, 2014, when Mod. P00301 was executed unless it was specifically reserved. We deny the Air Force's motion under this argument, as the government's position is unsupported by fact and/or law. We grant appellant's motion for summary judgment and agree that Mod. P00301 does not bar the claims underlying this appeal.

VI. Appellant's Second Cross-Motion for Summary Judgment: "No Other Contract Modification Released Lockheed Martin's Instant Claims"

A. *The Appellant's Position*

The government's pleading raised the affirmative defense of release in numerous contract modifications[20] (*see* SOF ¶ 54 (citing the government's answer at 42)). Lockheed Martin captions its second cross-motion for summary judgment as "No Other Contract Modifications Released Lockheed Martin's Instant Claims." It points out that "The Government also inserted the release language of P00301 into numerous other contract modifications that were described in the Government's Motion (but upon which the Government did not ultimately move for summary judgment)." Among modifications containing the same release language as Mod. P00301 are Mods. P00067

---

[19] Because we find the release in Mod. P00301 to be unambiguous, it is unnecessary that we consider appellant's alternative arguments, made in the event the Board found that to be the case; *see, e.g.*, app. mot. & opp'n at 27-33.

[20] Specific modifications cited in the government's answer were Mods. P00178, P00253, P00263, P00301, P00336, P00346, and P00396 (answer at 42).

P00075, P00102, P00116, P00166, P00182, P00196, P00228, P00235, P00263, P00300, and P00346.[21]  (App. mot. & opp'n at 33-34)

The appellant contends that the plain meaning of each of these releases, which it says were prepared by the government, does not bar its claims because these "do not arise out of, nor are they in connection with, the changes effected by *any*" of these modifications.  It says these modifications "fall into two main categories," neither of which relates to its claims.  The first category is "funding modifications that established O&A R3 CLINs or increased their value/obligation," which Lockheed Martin says includes Mods. P00075, P00116, P00196, P00228, P00235, P00263, P00300, and P00346.  The second category is comprised of modifications unrelated to the OA& CLINs that exercised non-O&A CLINs, such as RERP Installation CLINs; these include Mods. P00067, P00102, and P00166.  (App. mot. & opp'n at 38-40) (emphasis supplied by appellant)

Lockheed Martin buttresses its assertion with "undisputed" material facts that provide additional information concerning the terms of key contract modifications including Mods. P00067, P00075, P00116, P00102, P00166, P00196, P00182, P00228, P00235, P00263, P00300, and P00346.  Appellant says that each of these modifications contains release language that also confined LMA's release of claims to "any and all liability under the contract for further claims or equitable adjustments arising out of or in connection with the changes effected hereby" and that "All other contract terms and conditions remain unchanged and in full force and effect."  (App. mot. & opp'n at 38; *see also* SOF ¶¶ 18-19)

The contractor contends that although Mod. P00182 "does not squarely fall within either of the two general categories" of "funding" and "non-O&A CLINs" described above, "it nevertheless, did not release Lockheed Martin's instant claims." LMA explains that while Mod. P00182 made a number of changes to the contract, including unrelated administrative changes, "convert[ing] the R3 activities from a Time-and-Materials basis to a Cost-Plus-Fixed-Fee basis beginning 29 April 2013," and "establish[ing] Lot 3 CPFF R3 CLIN 3020, Lot 4 CPFF R3 CLIN 4025, Lot 5 CPFF R3 CLIN 5021," none of these are connected with the changes in its claim. (App. mot. & opp'n at 40-41)

---

[21] Lockheed Martin categorizes Mods. P00075, P00116, P00196, P00228, P00235, P00263, P00300, and P00346 as "clearly and unambiguously limit[ing] the release to claims based on the Government's addition of funding to the Contract."  It says "the only change in these modifications is the exercise of certain CLINs or the addition of funding, documented by increasing the relevant O&A CLINs and updating the relevant contract administration data." (App. mot. & opp'n at 39-40)

LMA references the government's motion for the proposition that the Air Force does not take exception to this statement (app. mot. & opp'n at 41 (citing gov't mot. at 4, GUMF ¶ 4) ("The CLINs for O&A work on Lots 3-5 did not establish 'the nature of O&A repairs, the number of O&A repairs, or the level of effort for the particular O&A repairs that LMA ultimately would be required to perform…")). Lockheed Martin argues that "extending the release" in the specified modifications (as urged by the government) to claims in the appeal "would render the critical language of the release for claims – that it was for claims 'arising out of or in connection with *the changes effected hereby*' – meaningless." This would be in contravention of the requirement that "'An interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous.'" (App. mot. & opp'n at 41 (citing *NVT Techs.*, 370 F.3d at 1159; *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991))) (emphasis supplied by appellant)

Additional arguments raised by LMA include that there are triable issues concerning the government's continued consideration of "the merits of Lockheed Martin's claims long after these modifications and their respective releases had been executed." According to the contractor, this indicates that neither party intended the release to bar LMA's claims. Appellant also alleges that the doctrine of *contra proferentem* applies if there is any ambiguity because the government drafted the modifications and releases in question. (App. mot. & opp'n at 33-34, 42-43)

### B. The Government's Position that Lockheed Martin's "Cross-Motion #2 Fails Because P00178 Released LMA's Claims"

In responding to LMA's second cross-motion for summary judgment that "No Other Contract Modification [beyond Mod. P00301] Released Lockheed Martin's Instant Claims" (*see* app. mot. at 33-34), the government maintains that "Bilateral Contract Modification P00178 included a broad release of claims" that causes LMA's second cross-motion to fail (gov't reply & opp'n at 14-15). Our analysis of the government's position is hampered by the lack of clarity of its argument.

As best we understand, the government makes three arguments relating to Mod. P00178 in opposing appellant's second cross-motion. First, the government states that although it "is relying at this time on the release in [Mod.] P00301 as an alternative argument supporting [its own motion for] summary judgment," the Air Force "believes that P00178," which "included a broad release of claims" also "bars LMA's certified claim." Second, the government maintains that the release in Mod. P00178 "show[s] that LMA recognized the need to include a reservation of rights to preserve claims, as noted by the Federal Circuit in *Bell BCI* should be done." In contrasting the release in Mod. P00178 with the one in Mod. P00301, the government contends that "LMA did not preserve any O&A 'legacy' impact or DCMA 'over-inspection' claims" in the

48

latter.  Third, without greater specificity, the government asserts that the Board must construe the release in Mod. P00178 "in the government's favor as barring LMA's claims with respect to the alleged 'excessive O&A work changes'" due to "the rules that apply in deciding summary judgment motions against the non-moving party." (Gov't reply & opp'n at 14-15)

### *Decision on Appellant's Second Motion for Summary Judgment that "No Other Contract Modification Released Lockheed Martin's Instant Claims"*

We agree with Lockheed Martin's interpretation of the contract modifications cited in its second motion for summary judgment.  A "plain reading" of these modifications and the releases therein do not bar the claims that undergird this appeal. It is unnecessary for us to consider the contractor's alternative argument that the parties' continued consideration of its claims indicates that the releases were not understood to encompass these claims.  Because we find no ambiguity in the referenced modifications and releases with respect to barring the claims at issue, we need not address LMA's argument employing the doctrine of *contra proferentem* either.

Although we have given the government's arguments careful consideration, its contentions are unavailing and do not meet the criteria for successfully opposing summary judgment.  The Air Force failed to show any disputed material facts that would preclude favorable judgment on appellant's second cross-motion, and its arguments regarding Mod. P00178 are unpersuasive.  Despite the government's contention that Mod. P00178 "bars LMA's certified claim" (gov't reply & opp'n at 14), it is uncertain whether the government means this in a literal sense, as it does not cite any part of that modification (or the release therein) to support this proposition or explain its basis for this position.  To the extent that the Air Force contends that Mod. P00178 foreclosed the instant claim, that allegation fails for want of support.

Or, if it is the substance of the government's argument that:  (1) the contractor demonstrated in Mod. P00178 that it knew how to clearly reserve its rights with respect to a particular issue; (2) LMA failed in Mod. P00301 to do so specifically regarding its current claims; and thus (3) appellant forfeited the claims underlying this appeal, we remain equally unconvinced.  The government did not establish an adequate legal or factual foundation that the release language in Mod. P00178 means that appellant should have worded Mod. P00301 differently to preserve the claims at hand.  In any event, as discussed in § V *supra*, we have found that appellant did not release its rights to the instant claims in Mod. P00301 due to the language that limited the scope of the release to that modification.

Finally, we reject the government's proffered procedural justification for opposing LMA's second cross-motion for summary judgment (*see* gov't reply &

opp'n at 14-15).[22]  It is the Board's understanding that the government is alleging that we must construe the release in Mod. P00178 in the same manner as the Air Force, since the government is the non-movant and opposes LMA's second cross-motion.[23] If we correctly surmise the government's intent (and even if we are unable to determine what the Air Force meant), we reject the government's procedural argument which is, at best, inchoate.

Our evaluation of this argument is unaided by the government's failure to furnish a legal analysis, or any citation to law, precedent, the Rules of the ASBCA, the Federal Rules of Civil Procedure, or the Federal Rules of Evidence to support its position.  The government does not advise regarding what, in particular, "the rules that apply in deciding summary judgment motions against the non-moving party" happen to be that it is relying upon (*see* gov't reply & opp'n at 15).  Although we are loath to speculate as to what the Air Force means here (and it is the duty of its counsel to sufficiently articulate its client's position), if it is the government's point that there are disputed material facts precluding summary judgment, then it should have said so and supported that premise with fact and law.  Whether or not we correctly interpret the government's assertions, these are unavailing, as we are unable to discern how the

_____

[22] This is the government's procedural argument in full:

> In any event, since the government is the non-moving party with respect to LMA's Cross-Motion #2, the release in P00178 must be construed in the government's favor as barring LMA's claims with respect to the alleged "excessive O&W [sic] work changes" resulting in "cumulative impacts to the performance of the fixed-price RERP effort."  (Gov't R4, tab 2 at 21).  The government also notes that the Declaration of Steven Pilcher (LMA Response Exhibit 1) does not list P00178 that he negotiated and signed for LMA, or include any explanation by him of his understanding of the scope of the release language with respect to "legacy" and DCMA "inspection" issues included in LMA's certified claim.
>
> LMA's Cross-Motion #2 cannot be granted under the rules that apply in deciding summary judgment motions against the non-moving party.

(Gov't reply & opp'n at 14-15)

[23] We suspect that the government is conflating factual disputes, which we do construe in the non-movant's favor, with legal disputes (such as the interpretation and legal effect of the contract provisions at issue here), which we do not.

50

government met its well-established burden in opposing LMA's second cross-motion (*see, e.g., Celotex*, 477 U.S. at 324 (citing FED. R. CIV. P. 56(e)).

The parties to this appeal were reminded not long ago of the relative burdens of proof borne by the movant and nonmovant in motions for summary judgment in a decision that granted Lockheed Martin's motion for summary judgment relating to the government's affirmative defense of laches. The standard bears repeating:

> For purposes of the motion, [the nonmovant] must demonstrate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (citing Fed. R. Civ. P.56(e)). As nonmovant, the government must "make a showing sufficient to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. The government cannot rest upon mere denials or conclusory statements, as these are insufficient to withstand summary judgment. *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 836 (Fed. Cir. 1984).

*LMA*, ASBCA No. 62209, 21-1 BCA ¶ 37,891 at 184,024.

For the reasons discussed, we grant Lockheed Martin's second cross-motion for summary judgment. We agree that no contract modification (Mod. P00301 is discussed separately in § V *supra*) has been shown to release LMA's claim underlying ASBCA No. 62209.

DECISION ON THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

We have considered all arguments advanced by the parties, whether discussed in detail or not. For the reasons set forth, we deny the government's motion for summary judgment on each of the bases it argues (*see* §§ II-V) and grant appellant's two cross-motions for summary judgment (*see* §§ V-VI).

Dated: August 3, 2022

REBA PAGE
Administrative Judge
Armed Services Board
(Signatures continued)                     of Contract Appeals

I concur                                        I concur


RICHARD SHACKLEFORD                             J. REID PROUTY
Administrative Judge                            Administrative Judge
Acting Chairman                                 Vice Chairman
Armed Services Board                            Armed Services Board
of Contract Appeals                             of Contract Appeals


I certify that the foregoing is a true copy of the Opinion and Decision of the
Armed Services Board of Contract Appeals in ASBCA No. 62209, Appeal of
Lockheed Martin Aeronautics Co., rendered in conformance with the Board's Charter.

Dated:  August 3, 2022


PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals